UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

04 SEP -2 AM 9: 12

U.S. DISTRICT COURT
ND OF ALABAMA

EVER HIGGINS,                    )
                                 )
    Plaintiff,                   )
                                 )
        v.                       )        CV 02-PT-1828-M
                                 )
TYSON FOODS, INC.,               )
                                 )
    Defendant.                   )

**ENTERED**
SEP 2/2004

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant Tyson Foods, Inc.'s ("Tyson") motion for

complete or partial summary judgment, filed on April 16, 2004.

### FACTS[1] & PROCEDURAL HISTORY

**I.    Parties**

Tyson, the word's largest producer/marketer of protein products, operates several complexes

in Alabama.[2] Each complex consists of multiple facilities. The Oxford Complex in Alabama is at

issue in this case. Four facilities make up the Oxford Complex: Heflin (processing), Ashland

(processing), Talladega (feed mill), and Anniston (hatchery). The position at issue is in the Oxford

---

[1] The court notes where "facts" appear disputed.

Because plaintiff's response brief identified dismissal of Counts VII through XII as well as dismissal of "her claim alleging discrimination when she was wrongfully denied a six month review and raise for the promotional decision to the Southeast training manager position," this court will not state facts related to the denial of a six month review and raise for this position.

[2] Tyson provides a number of details from Cathy Clark-Johnson ("Clark-Johnson") about its Alabama facilities and the chicken process itself. This court has considered but not recounted these details here.

1

Complex, which is an oversight office as opposed to a production facility. John Pittard is Complex Manager of the Oxford Complex. As Complex Manager, Tyson asserts, Pittard is the final authority and decision-maker in that complex and its facilities.[3]

## II.   Higgins's Initial Employment and Hourly Positions (1976-1985)

Higgins, an African-American female, is forty-nine years old. Prior to working at Tyson, Higgins was not employed full-time. Higgins received her high school diploma in 1973, then attended Gadsden Business College from 1973-74 and then Gadsden State.[4] Higgins began working for Tyson as a Saw Operator in the Gadsden facility in the Snead Complex in July 1976.[5] Since that time, she has had several promotions and continues to work for Tyson today. Approximately three years after beginning at Tyson, Higgins became a Quality Assurance Technician in September 1979.[6] She worked in this capacity until January 1982, defendant asserts, when she became a Quality

---

[3] However, plaintiff argues, in defendant's discovery responses it identified both Pittard and Don Schaeffer, Director of HR Operations, as decision makers.

[4] In 1991, Higgins attained a B.S. in management from Jacksonville State University, continuing to work at Tyson while she pursued her degree.

[5] According to Higgins, her job responsibilities as Saw Operator included "Sawing six to eight chickens a minute into eight or nine pieces on a rotating saw as a team effort to meet daily orders for specified customers."

[6] As Quality Assurance Technician, Higgins's responsibilities allegedly included the following:

> Performing periodic checks on products and equipment to ensure adherence to customers (*sic*) compliances, working closely with all levels of productions (*sic*) (management and hourly) and USDA personnel maintaining a good working relation that fostered teamwork in a facility of 1200 Tyson team members and approximately 20 USDA employees; Assisting USDA personnel in conducting period product testing; and Conducting tests, recording results and maintaining Tyson/governmental records of test (*sic*) performed and any corrective actions taken if needed.

Assurance Leadperson – the last hourly position Higgins held at the company.  Higgins, on the other hand, says that from January 1982 – February 1987, she held the position of Quality Assurance Supervisor.[7]

### III.   Higgins's Advancement in Management Positions (1985-1998)[8]

In January 1985, Higgins was officially promoted from Quality Assurance Technician to Quality Control Supervisor, a salaried managerial position in Gadsden.  Higgins received a raise from $5.59/hour to $16,000 annually.  Prior to receiving the promotion, Tyson alleges, Higgins had unofficially served as Quality Control Supervisor.[9]  In September 1985, Higgins received her first written evaluation following her promotion.  Neal Ballard ("Ballard"), Higgins's supervisor, evaluated her as excellent with an overall rating of 95.  In March 1986, Ballard again evaluated her performance as excellent with an overall rating of 86.  Higgins received a similar evaluation in September 1986: excellent with overall score of 92.  Ballard further noted on this evaluation that Higgins was "a joy to work with."

_____

[7] According to Higgins, Quality Assurance Supervisor responsibilities were the following:
- Overseeing twelve Quality Assurance Technicians with the above-mentioned duties;
- Hiring and testing of QA Technicians;
- Handling all Human Resources responsibilities relating to the twelve technicians.  This included, but was not limited to, administration of policies, procedures, disciplines, attendance records, etc.
- Working closely with customers such as Popeye's, KFC, Churches, etc., on compliance and audits.

[8] At all relevant times to this lawsuit, Higgins alleges, her job performance was satisfactory and Tyson had no complaints about her performance.

[9] In her job description, this court notes, Higgins lists that she was a quality assurance supervisor from January 1982 – February 1987, with no mention of an official promotion in 1985.

3

In late June 1987, Higgins's title at the Gadsden plant was changed from Quality Control Supervisor to Quality Control Manager.[10]  Her salary increased from $18,326 annually to $19,000 annually. Pittard was then Plant Manager in Gadsden.[11]  Higgins continued to report to Ballard after this.  Higgins laterally transferred from Quality Control Manager to an Employment Supervisor

---

[10] Higgins alleges that she served in the role of "Quality Assurance Manager" from February 1987 – May 1989.  As a Quality Assurance Manager, Higgins alleges, her responsibilities included:

- Overseeing twelve Quality Assurance Technicians with the above mentioned duties, two QA Supervisors, over a three-shifts facility of 1200 people;
- Hiring and Testing of QA Supervisors and Technicians;
- Overseeing all duties listed above for the QA Technician and QA Supervisors;
- Conducting written evaluation of supervisors and reviewing technician evaluations;
- Conducting productions and customer meetings;
- Conducting Compliance Audits, i.e., safety, customers, product, etc.
- Oversee[ing] safe product handling, corrective actions for noncompliant product, and QA protocol;
- Writing and implementation of Standard Operating Procedures for new programs and processes for Tyson and USDA compliance;
- Implementation and overseeing new QA Lab and Microbiology testing.

[11] Defendant asserts that Pittard was involved in approving plaintiff's promotion to Quality Control Manager and cites plaintiff's deposition testimony.  However, the Court notes that plaintiff actually testified that she did not know whether or not Pittard had approved the promotion.  (Higgins Depo. p. 52).

position in May 1989.[12]  As Employment Supervisor, Higgins was under Pittard's line of authority.[13]

Throughout her tenure as Employment Supervisor, Higgins received several pay increases, all while she was under Pittard's line of authority.  In August 1993, Higgins was again promoted at the Gadsden plant, from Employment Supervisor to Night Shift Personnel  Manager.[14]   Her

---

[12] As employment supervisor, her responsibilities allegedly included:
- Supervising three Retention Trainers and three HR clerks;
- Maintaining staffing for facility of 1200 team members on three shifts;
- Hiring, recruiting, and retention of the hourly and management work force to ensure Equal Opportunity for all;
- Coached, counseled and assisted in terminations;
- Administered and maintain[ed] Bid System and Job Transfer Program for 1200-member facility;
- Administration of HR policies and procedures;
- Assisted in maintaining and completion of the Affirmative Action Plan.

[13] According to Higgins, she made this move to get away from Ballard, whom she alleged sexually harassed her in 1988 – 89, allegedly making inappropriate comments, giving her a birthday cake shaped like a penis, and giving her a card that said "I thought chocolate was sweet until I met you."  Following these events, Higgins talked to Clarence Wilson, Personnel Manager, and requested a transfer.  According to defendant, Pittard was responsible for granting the transfer.

Tyson argues: "To the extent, if any, Higgins alleges that Ballard's alleged conduct is a part of this lawsuit, the claim is clearly time-barred, and should be dismissed for failure to exhaust administrative remedies, as Higgins did not file her EEOC charge until November 2000 and did not mention this incident.  Furthermore, assuming Higgins had timely filed a charge and raised the sexual harassment allegations, Tyson took prompt remedial action to end the harassment.  For these reasons, any claim regarding Ballard's alleged conduct must be dismissed at summary judgment."

However, this court notes, plaintiff does not appear to be basing any of her claims in this lawsuit on Ballard's conduct.

[14] According to Higgins, she held this position from August 1993 – January 1994.  Her responsibilities included:
- Developed and implemented duties for the new position (it was the first time for this position at the Gadsden location);
- Supervised two nurses, two HR clerks, three retention trainers, two benefits counselors;

promotion was approved by several individuals, including Pittard.  Allan Trotter ("Trotter"), who

was Gadsden Plant HR Manager at the time,[15] became Higgins's direct supervisor as a result of the

promotion.  Five months later, in January 1994, Higgins was promoted to Plant Personnel Manager.[16]

---

- Oversee second and third shift HR functions;
- Administration of policies and procedures;
- Manager and Advisor of employment policies and practices;
- Conducted meetings with hourly and salary team members;
- Labor relations/conflict resolution;
- Monitoring disciplinary actions to ensure fairness and consistency;
- Training of hourly and salary team members
- Overseeing Medical and Workers' Compensation;
- Benefits counseling and special project enrollment;
- Unemployment hearing representative;
- Assisted in maintaining and completion of the Affirmative Action Plan.

[15] Trotter is now the Complex HR manager for the Snead Complex.

[16] In this position, Higgins states, she had responsibilities which included:
- supervising multiple areas with a total of 25 team members (the court has considered but does not list all of these areas)
- Maintain budgets for the above-mentioned areas;
- Administering and managing all personnel, safety, and security functions;
- Compensation i.e. wage reviews/vacation compensation/payroll functions, etc.
- Recruitment, selection, hiring, etc. – all functions necessary to maintain 1200 team members;
- Labor relations, contract negotiations, mediations, arbitrations, union meeting, ADR, etc.;
- Monitored and oversaw benefits; Medical/Workers' Compensation;
- Developing location Affirmative Action Reports/Program;
- Monitoring adherence to EEO, FMLA, ADA, etc. employment laws; monitored turnover and prepared reports on rates;
- Conducting training for supervisors and managers on EEO/AA, FMLA, ADA laws and plant personnel policies such as Harassment/Discrimination, Absenteeism, etc.
- Conduct Harassment/Discrimination Investigation and training, etc.
- Monitoring all disciplinary actions to ensure fair and consistent application of HR Policies;
- Monitoring hiring, selections, job performance, wages, hours, etc. of security personnel;
- Oversee all safety aspects of facility of 1200 team members.  Including safety and

In January 1997, Higgins sought a promotion to Ashland/Heflin Complex HR Manager. Higgins alleges that the decision-maker with regard to that promotion was Wally Taylor ("Taylor"). Taylor selected Doug Quillen to fill the position.[17]

## IV.   The Offer and Acceptance of the Division Training Manager Position.[18]

In June 1998, Higgins was offered and received a lateral transfer into a Division Training Manager position.[19]  She still serves in this position.  According to Higgins, she accepted this

---

ergonomics programs, annual OSHA, EPA, etc. requirements, etc.
- Working with attorneys in all plant-related legal activities;
- Community relations representative;
- HR Association representative;
- All duties involved in administering and managing all areas of personnel, safety, and security.  Not limited to the above-mentioned.

Higgins asserts that most of her twenty-eight years with Tyson has been in the area of management in Human Resources.

[17] Higgins testified that Taylor interviewed her and stated that he had "two strong white males" and Ashland/Heflin and could she work with them.  Although Higgins testified that she was "shocked" by the alleged comment and thought it was discriminatory, she did not report it to anyone at Tyson until after she was denied the position.

In this regard, Tyson argues: "To the extent that Higgins asserts that the denial of this promotion is a part of her lawsuit, again this claim is clearly time-barred, as Higgins failed to file an EEOC charge within 180 days of the denial of the promotion.  As a promotion decision is a discrete employment action, it cannot be considered a part of a continuing violation if it falls outside of the 180-day period. *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2000).  Furthermore, assuming this claim would not be time-barred, Higgins has not presented substantial evidence that the successful candidate was equally or less qualified than Higgins for the position."

[18] Plaintiff has voluntarily dismissed any claims regarding "wrongful denial [of] a six month review and raise for the promotional decision to the Southeast training manager position."

[19] As Division Training Manager, Higgins alleges, she had/has the following duties:

- Establishing a formal Training Center for the Southeast area (Oxford, AL).  This was a first for the Southeast area.  Tyson had never had a successful formal

training position with the understanding that she would be reviewed in six months and that a pay raise would be given at that time.  Clarence Wilson ("Wilson"), an African-American, was the Oxford Complex HR Manager who approached Higgins about the Training position.  Higgins's responsibilities in this position included coordinating employee training efforts, scheduling instructors, notifying the attendees, planning the annual budget for the training center, and maintaining the inventory.  Higgins also trained employees and prospective trainers.

---

Training Center in this region.  Several unsuccessful attempts had been made but failed;
- Supervise 2 team members – one training coordinator, one training instructor.
- Manage 2 Training Centers - Oxford, AL and Wilkesboro, NC as of 2003;
- Conduct need assessments of surrounding facilities;
- Curriculum development for training center;
- Selection and training of 15-20 facilities;
- Coordination and implementation of training sessions, schedules, and classes;
- Manage a $250,000 Budget;
- Facilitation of training classes on Leadership Development for all salary team members within the Southeast service areas which include Alabama, Georgia, Mississippi, Indiana, Kentucky, Tennessee, etc.  Training on Leadership Skills, Management Skills, Communication Skills, Teambuilding, Conflict Resolution, Professional Development, Coaching, etc.;
- Conduct/Coordinate Training on HR policies i.e., harassment/discrimination investigations, ethics, code of conduct, etc;
- Assist with other HR training upon request, i.e., union avoidance, other site specific training;
- Establish community relations with surrounding vendors and suppliers i.e., hotel, motels, restaurants, catering, supply stores, etc.;
- Conduct and coordinate regional rollouts for new policies and training, i.e., HR;
- Conduct regional annual Affirmative Action training;
- Conduct and coordinate I-9 testing;
- Conduct and coordinate training classes for Management support, trainers and leads in the above-mentioned service areas.  This is also a first for this area;
- Implementation of new retention program in high turnover plants throughout the company.  Travel 50% of time to plants with high turnover to implement retention program;
- Conduct retention meetings with upper management at targeted retention locations.

8

V.   **Oxford Complex HR Manager Position (late Spring/Summer 2000)**[20]

In April or May 2000, Wilson announced his intention to leave Tyson, thereby leaving a

vacancy for his position as Oxford Complex HR Manager.[21] Once Pittard became aware of Wilson's

imminent departure, he set out to find Wilson's replacement.  Pursuant to Tyson policy, Pittard

posted the position on Tyson's intranet site in early June 2000.  On June 8, 2000, Higgins sent Pittard

an email informing him of her interest in the position.  In addition to Higgins, three other current

Tyson employees expressed interest in the position: Jacinta Carter (African-American female, age

_____

[20] By plaintiff's account, Tyson did not follow its own human resource policy on seniority
in offering the Oxford Complex HR position to Carter or Burdick over Plaintiff.  This court notes
that the cited policy, *see* Pl. Ex. 6 (and having an effective date of 8/1/93), stated in pertinent
part:

> ...Tyson Foods, Inc., considers seniority a reflection of company loyalty and
> rewards its team members for their dedication.

> Seniority is the length of a team member's continuous, full-time service,
> or its equivalent, under the Full-Time Equivalency Policy....

> Accrued benefits and rights for team members who establish seniority with
> the company are as follows:
> (1)    Transfer/layoff/recall/promotion
> (2)    Various company benefit programs
> (3)    Tyson's Service Recognition Program
> (4)    Wage increases based on progressive rate structure and company
>        seniority
> (5)    Preferential vacation selection.

[21] Higgins cites Trotter's deposition for the fact that Wilson had taken the Oxford
Complex HR manager position as a demotion from Divisional HR manager when it became clear
he would have to relocate from Alabama to Arkansas.

26); Lisa Burdick (White Female, age 26); and Lola Hithon (African-American female, age 38). *See* Pittard Decl. ¶ 4.

According to Higgins, the job requirements for this position, as listed on the Job Summary, were as follows:

> • Education: Requires broad knowledge in a general professional or technical field normally acquired through four years of college resulting in a Bachelor's degree;
> • Experience: 3 to 5 years;
> • Computer Skills: Requires basic computer skills. For example, generating simple letters, spreadsheets and creating simple queries. May require knowledge of Tyson Business Computer System.
> • Travel: 6 to 11 trips per year.
> • Supervisory Responsibilities: This position is responsible for Supervising a group of personnel in a single department or work unit who perform similar and/or interrelated tasks and activities.

Higgins exceeded the minimum job requirements. She had been employed full-time with Tyson for twenty-four years. According to Higgins, at the time of the employment decision at issue, she had fifteen years of Tyson managerial experience compared to Burdick's one and ½ years and Carter's two years.

• **Jacinta Carter**

From September 1996 through March 1998, Carter had worked for Tyson Credit Union, first as a Business Development Sales Representative (Jackson, MS) and then as a Business Development Manager (Springdale, AR).[22] In March 1998, Carter left Tyson Credit Union and began working for Tyson Foods as Shift Human Resources Supervisor at its Vienna, Georgia plant. She served in this

---

[22] While defendant stated that Carter had been employed with Tyson for four years prior to the Oxford HR Complex Manager decision, plaintiff asserts, she had only been employed full-time at Tyson Foods for two years. Instead, plaintiff asserts, Serrano testified that Carter had previously been employed as a sales representative with Phillips 66/Tyson Credit Union, which is not a part of Tyson Foods, Inc. but is an affiliate.

position until February 1999, when she was promoted to Plant Human Resources Manager at

Tyson's Buena Vista, Georgia plant.  Carter held this position at the time she applied for the Oxford

position in June 2000.[23]  Prior to working for Tyson, Carter had received a bachelor's degree with

dual majors in Business Administration and Spanish from the University of Kansas.  Plaintiff points

out that Carter had no knowledge of the Oxford complex at the time she was offered the Oxford

Complex HR Manager position, since she had worked in Georgia her entire Tyson career.[24]

---

[23] Plaintiff states that Carter applied for the Oxford HR Manager position in July or August 2000.

[24] At the time of applying for the position, Carter did not meet the minimum requirements of 3 to 5 years' experience for a Complex HR Manager position.  Prior to June 2000, Carter had approximately one and a half years of union experience.

Plaintiff alleges that Carter stated that she had been used by Tyson so Burdick could be given the Oxford position.  However, specifically, Carter testified:

Q:    After you interviewed at Oxford, did you and Ms. Higgins have a conversation:
A:    Yes.
Q:    And what was that conversation about?
A:    It was already after I was in Pine Bluff, just discussing the process, what happened, who was – who was selected, what was my process as far as the interview, how did Pine Bluff come into the picture, things of that nature.
Q:    Did you make a comment in that conversation that Tyson had used you?
A:    I do recall saying that, yes.
Q:    What did you mean by that comment?
A:    Based on the feedback and the analysis that I had got from Ever and the thought process, there's a lot of factors about the process.... And her chronology of it gave me the impression that it was something other than legitimate at the time.
Q:    What do you mean?
A:    Based on the criteria that was allegedly used in the selection process - I can only speak for myself.  I wasn't aware of the skills and qualifications that the person who got the job had over – all I knew of was Ever and just hearsay from Lola about what she had, other than her time in the position.  And then perspective I got from Ever at the time made it appear that what she was saying was true.
Q:    Which was what?
A:    I remember maybe you were just offered the job because you were a black female, and if you had turned it down and they offered it to a white female, it wouldn't

11

Carter had been evaluated by her supervisor at the Buena Vista plant on February 23, 2000. Higgins highlights various aspects of that review, contending that her performance was generally "standard" and needed attention in certain areas. Higgins highlights statements by Carter's supervisor that there were over two hundred openings still at the plant and that "much improvement has been made; but a lot more improvement needs to happen. Benefits enrollment, late terms, I-9, SAP training, etc. must continue to improve."

Higgins highlights Carter's acknowledgment in her deposition that she thought she wouldn't get the Oxford job because of the two "heavy hitters," i.e., Higgins and Hithon, who had been in HR and with Tyson much longer than her. Carter was surprised when she received the job offer from Pittard and was also surprised to have two job offers on the table at the same time.[25]

According to Carter, two weeks after her interview with Pittard for the Oxford Complex HR Manager position, she interviewed with Schaeffer for the Pine Bluff Complex HR Manager

--------

have been that big of an issue because they did offer it to black female first. I never had that thought process or conversation or anything with anybody prior to that. That was not my thought process in making my decision.

Q:    As you sit here today with a few more facts about the process, do you feel the process was manipulated and you used so a white female could be placed in the position?

A:    No.

[25] Specifically, this court notes, Carter testified:

Q:    Well, did you ever discuss that with Ms. Higgins, that you were surprised you had two offers?

A:    I may have said that.

Q:    And what was your - the basis of (sic) making that comment then?

A:    I was with the company what, two years at the time, and when I worked with the credit union, one of my goals was to be a complex HR manager, and there I was achieving that. So surprise, excitement, all of that.

12

position.[26]

- **Lisa Burdick**[27]

Burdick began her employment as part-time benefits[28] clerk with Tyson in June 1992, immediately following her high school graduation. Burdick worked as a Personnel Clerk her first four years with Tyson while pursuing her bachelor's degree in marketing,[29] which she received from Jacksonville State University in 1996.[30] From March 1996 until May 1997, Burdick served as Southeast Regional Insurance Coordinator. Between May 1997 and October 1997, Burdick was a Human Resources Trainee at Tyson's "North Alabama Complex."[31] Following her training, Burdick became (Night) Shift Human Resources Manager at the Gadsden facility (Snead Complex) in October 1997,[32] a position she held until December 1998. In December 1998, Burdick was promoted

---

[26] For more information regarding Carter's interview for the Pine Bluff position, *see infra*.

[27] According to Higgins's deposition, Pittard told her that he awarded the position to Burdick because she had a high energy, she knew the major, and other reasons (that he had back at the office).

[28] Higgins calls her a "part time benefits clerk." Tyson calls her a "personnel clerk." Burdick titles herself "Southeast Regional Insurance Coordinator" when she was a Clerk IV.

[29] In 1994, Burdick transferred to full-time work as a Clerk IV. As such, she audited other benefit counselors' work. Although Burdick started working part-time at Tyson in 1992, the part-time status from 1992 to 1994 was converted into a full-time equivalent, giving her the four years total full-time Tyson seniority.

[30] Thus, Higgins argues: "Four years of Burdick's seven years of Tyson seniority was part time while she attended college."

[31] Burdick was a management trainee under Higgins when Higgins was Plant HR Manager at the Gadsden plant.

[32] Plaintiff alleges that Burdick replaced Hithon as the shift personnel manager in July 1997 rather than October 1997 as alleged by Tyson. Higgins supervised Burdick for the time she held this position.

to Plant Human Resources Manager at the Ashland facility, which was the position she held when applied for the Oxford Complex HR Manager position in 2000.[33]

Higgins points out that Burdick is not bilingual and does not have a double major. According to Higgins, Pittard stated that Burdick was chosen for her low turnover rate at the Ashland plant while she was the human resource manager. The court notes there is no evidentiary citation for this. However, Higgins argues, Tyson's documents show that Burdick's facility, i.e., Gadsden, had the highest turnover rate at 114%.

- **Lola Hithon**

Hithon first worked at Tyson as a Sawhand in July 1985, a position she held until January 1987, when she became an Accounts Payable Clerk. In February 1989, Hithon was promoted to Frontline Supervisor (a production position) and remained there until May 1993, when she became Retention Supervisor/Plant Facilitator. In 1994, she was promoted to Employment Supervisor, her first non-production job. She worked in that position until March 1996, when she accepted the position of Acting Superintendent. From March 1995 until April 1997, she also worked intermittently as Shift Personnel Manager. From April 1997 through May 1998, Hithon served as Production Coordinator/Shipping Superintendent. In May 1998, she became Shift Manager. Hithon was promoted to Personnel Manager of the Gadsden plant the following March and held that position

---

According to Higgins, when Higgins was promoted to her next position after October 1997, Burdick was not chosen as Higgins's replacement, and Trotter did not recommend that Burdick replace Higgins. His reason for not replacing her was: "Because I felt like in life experience, that she would have a difficult time dealing with Randy Murphy, [the plant manager]." When asked "why," Trotter replied: "Just from the way he managed. My opinion, he had poor decision-making skills."

[33] Thus, Higgins asserts, at the time of the Oxford Complex HR Manager decision, Burdick had only been employed with Tyson full-time for four years.

14

at the time she sought the Oxford Complex HR position in 2000.

- **The Selection Process**

Carter applied for the position of Oxford Complex HR Manager in May or June of 2000. When Carter talked to Pittard, he told her she was one of four candidates being considered for the position. Pittard allegedly told Carter she was the last of the four to interview. Carter knew she did not meet the minimum qualifications for the Oxford Complex position but wanted to get her name out and let people know within Tyson that she wanted to move up. Trotter testified that he expected that the Complex HR Manager needed three to five years of management experience, not simply time with the company. In fact, Carter did not meet the minimum qualifications for the job. When asked whether Burdick met the minimum requirements, Trotter testified as follows:

> A:   It appeared to me that she met the three year.
> Q:   Where it says experience, three to five years, is that managerial experience or Tyson experience?
> A:   I think it would be HR experience.
> Q:   Did Ms. Burdick have three to five years?
> A:   It says she started in May '97 as a trainee, which I think I would count that.
> Q:   As management experience as a trainee?
> A:   Yeah, based on what it says what she was given to do.[34]

Pittard interviewed each of the four candidates in person at the Oxford Complex Office during the week of July 4, 2000. Prior to interviewing each candidate, Pittard alleged, he reviewed each applicant's resume and also sought references. With regard to Carter, Pittard contacted some of her current and past supervisors. According to Pittard, Carter received outstanding referrals from each person contacted. There was no person who had worked with all of the candidates, since Carter had worked mostly in Georgia.

---

[34] In his deposition, Trotter conceded that ideally you would like a candidate to have more than the minimum requirements.

With regard to the other three candidates – Higgins, Hithon, and Burdick – Pittard allegedly contacted current managers who were familiar with all three candidates: Wally Taylor (Snead Complex Manager); Mark Waller (former Oxford Complex Manager); and Allen Trotter (Division Training Manager)[35]. Pittard also contacted Johnny Whittaker, the Union Business Agent. Pittard allegedly asked each individual which candidate he would select for the Oxford Complex HR Manager position. According to Tyson, each reference stated that they would choose Burdick. However, plaintiff alleges, this is not true regarding Trotter. Furthermore, Higgins contends, Clark-Johnson stated that Pittard said he checked references with Wilson as well, who recommended Higgins.

Once all of the interviews were conducted, Pittard generated a matrix to assess his ranking of the candidates in the categories that he considered relevant to the position with 1 being the highest ranking and 4 being the lowest. The categories allegedly considered by Pittard were education, HR Manager experience,[36] total HR experience,[37] references,[38] community involvement,[39] willingness

---

[35] According to Pittard, Trotter initially said he would choose Higgins to avoid a lawsuit. After Pittard told him to put that consideration aside and choose the best candidate, Pittard stated, Trotter said Burdick represented the best candidate.

[36] This category ranked years as a Plant HR Manager.

[37] This category ranked the total number of years each candidate was in HR. Pittard determined this ranking by examining the candidates' resumes.

[38] Carter's ranking was based upon Pittard's conversation with her supervisors. The other candidates' rankings were based upon Pittard's conversations with Taylor, Waller, Trotter, and Whittaker, as well as Pittard's own knowledge of their work history and performance.

[39] Pittard ranked this based upon their interview discussion of community involvement.

16

to relocate, motivation and drive,[40] presence,[41] and relationship with the union.[42] Defendant provides the matrix, completed by Pittard on July 14, 2000, which this court has considered fully but not set out here.

Pittard testified that he decided that Carter was the most qualified for a number of reasons: her college degree, her bilingual abilities, her great successes in her current plant, her high references, her willingness to relocated, her high degree of enthusiasm/motivation, and her extremely good interview. Pittard made an "informal" job offer to Carter for the Oxford job by telephoning Carter and telling her that she was the "top choice" for the Oxford Complex HR Manager position but that he had been asked to let her interview at another position in Pine Bluff, Arkansas.[43]

During her interview, Pittard alleged, Carter gave specific answers to Pittard's questions and descriptions of programs that she had initiated in her current role as Plant HR Manager. Pittard also felt that Carter was innovative because she developed solutions to tough problems.

---

[40] This ranking was "primarily based on their enthusiasm they brought to the interview and how self-motivated they seemed to be in their current status, and that was gathered strictly in the interview."

[41] According to Pittard, this ranking was "based on focus during the interview, how they stayed on track, how well they answered the questions they were asked, and how accurate they are, how they present theirselves (*sic*) during the interview process."

[42] Higgins's, Hithon's, and Burdick's ratings were based on Pittard's conversations with union representative Whittaker, and Carter's rating was based upon Pittard's conversation with her supervisors and her interview.

[43] While plaintiff cites Pittard's deposition at p. 172 for the proposition that "there was no discussion with Carter about salary, relocation or any of the details ... associated with a job offer," the court cannot find such evidence on that cited page.

17

Pittard spoke to Schaeffer[44] and informed him that he wanted to offer Carter the position. In reply, Schaeffer asked Pittard if he would postpone the announcement of his selection to allow Carter to interview for the Pine Bluff, Arkansas Complex HR Manager position, and Pittard agreed.

As a result, on July 14, 2000, Pittard emailed all of the candidates and informed them that a decision would not be announced that day. Pittard also called Carter and "told her that she was the top choice" and that the job was hers but that he had been asked to wait on the official announcement to allow her to interview for the Pine Bluff position. According to Pittard's declaration, he told Carter not to let the people at Pine Bluff talk her out of taking the Oxford position. However, he did not believe that Carter would take the Pine Bluff position because it meant moving farther away from her family. Pittard was out of the office on vacation the following week, July 17-21, 2000. According to Carter and Schaeffer, Carter interviewed in Pine Bluff for the Complex HR Manager position with the understanding that she had already been offered the same position in the Oxford Complex.

According to Schaeffer's deposition, from the onset of the selection process for filling the job, Tyson began soliciting Carter for the Pine Bluff Complex HR position there. While Tyson had been unable to fill the Pine Bluff position for 6 months, *see* Carter's deposition, it did not begin soliciting Carter until she was in the pool of applicants for the Oxford position. *See* Schaeffer Dep., pp. 24-25. According to Carter, she knew nothing about the Pine Bluff job until she was contacted after her Oxford Complex interview with Pittard. Schaeffer made two or more calls to Carter asking her to apply to the Pine Bluff job. Schaeffer did not make it a secret to Carter that he wanted the

---

[44] Schaeffer was the divisional human resource manager for the Oxford facility. Defendant has identified him as one of the decisionmakers for the Oxford Complex HR Manager job, along with Pittard.

18

Pine Bluff job filled yesterday. According to Carter, she felt a sense of urgency to fill the Pine Bluff job more so than the Oxford job. According to Schaeffer, Carter knew that Schaeffer was the Division HR Manager and that she would be reporting to him (at least indirectly) in both jobs.

Higgins asserts that while the Complex Manager is the person responsible for interviewing and selecting candidates for Complex HR Manager, Schaeffer (Division HR Manager) interviewed Carter for the Pine Bluff job but not for the Oxford job.[45] According to Carter, when she went to Pine Bluff for the interview and plant tour, Schaeffer offered her the job on the spot. She was the only person interviewed for the Pine Bluff job by Schaeffer. Schaeffer was also responsible for discussing the final choice for the position and making sure that the Complex HR Manager selected had the approval of the corporate office. Dan Serrano ("Serrano"), Vice President of HR, was the corporate contact who would approve the decision.

Schaeffer was responsible for ensuring that Serrano approved the selected candidates. Serrano had to approve all offers. Serrano stated that Schaeffer presented Carter's name to him for approval for both the Oxford and Pine Bluff jobs. In July 2000, the corporate HR staff met in Springdale, AR, and Schaeffer participated. Tyson's corporate human resource minutes from the

---

[45] Schaeffer did not contact Higgins to inform her of the Pine Bluff position. According to Schaeffer, Higgins had been asked to work with the Pine Bluff plant several times regarding the union organization attempt, and Schaeffer had worked with her at that location. The union campaign failed.

When asked "Do you contribute some of the success of that union campaign being a failure to her?," Schaeffer responded "Sure." The court notes that the question is less than clear.

Schaeffer had no complaints with Higgins's work while at the Pine Bluff plant. Higgins spent the better part of the summer of 1999 fighting the union campaign. Higgins had good rapport with the team members, and Schaeffer did not know why he didn't offer the Pine Bluff position to her.

July 2000 meeting, prior to any offers being made to Carter or Burdick, record Schaeffer as reporting "Search for Complex HR Managers in Oxford and Pine Bluff. Will make two offers next week."

After Carter accepted the Pine Bluff job, Schaeffer told Carter that she needed to call Pittard and decline the Oxford job for Affirmative Action Plan ("AAP") purposes, which Carter thought was a little odd. Carter believed that Schaeffer told her to call and decline the job for AAP purposes so that Carter would be in the candidate pool of African-Americans for the Oxford position to have been offered and declined it. Once Pittard returned from vacation, Carter told him that she had decided to take the Pine Bluff position. According to Pittard, she told him that taking the Pine Bluff position would further her career at Tyson and be a better career move. Pittard was surprised by her decision, but Carter believed that the Pine Bluff position would further her career at Tyson because the Complex had many problems. Carter told Pittard that she believed that if she could make a positive difference in the Pine Bluff Complex, it would strengthen her career possibilities.[46]

After Carter decided to accept the Pine Bluff position, Schaeffer scheduled a conference call on July 24, 2000 regarding the Oxford Complex HR position. Schaeffer, Pittard, Dan Serrano, Cathy Clark-Johnson, and possibly Tim McCoy participated in this conference call. Schaeffer explained the circumstances and what had transpired with Carter and then asked Pittard who was his second choice. Pittard replied that Burdick was. The decision to hire Burdick was approved during this conversation on July 24, 2000. Pittard then extended the offer to Burdick, which she accepted on July 24, 2000. According to Higgins, Pittard informed her on July 25, 2000 that he had selected Burdick for the position.

---

[46] Within two years of this promotion to Pine Bluff, Carter testified, she was demoted for race discrimination and retaliation on Tyson's own investigation. With her demotion, Carter received a $10,000 raise.

According to Higgins, Schaeffer testified that he and Pittard discussed Tyson selecting a white female over the minority candidates remaining.[47]  In determining qualifications for the Complex HR Manager positions, Schaeffer was looking for HR and poultry experience.  Based on the job summary for the positions, Schaeffer believed the positions (at Pine Bluff and Oxford) required "a general experience in management and HR and in – I was particularly looking for poultry HR experience."  He specified that "we're probably looking for management or experience in the industry of three to five years," and he defined "experience in the industry" as "general management experience not necessarily just in poultry, although that would be helpful."[48]  Schaeffer had never worked with Carter.  He knew of her only through his other "HR contacts" but could not say specifically who.

## VII.   Higgins's Complaint about the Promotion Decision

On July 26, 2000, Higgins emailed Schaeffer, Pittard, Moran, and Clark-Johnson a general

---

[47] Specifically, this court notes, Schaeffer stated as follows:

> Q:   Did you and Mr. Pittard have any discussion relative to that decision [hiring Burdick] that there were concerns about the possibility of that decision being perceived discriminatory because Ms. Higgins and Ms. Hithon had more years of experience than Ms. Burdick?
>
> A:   I don't remember those – I certainly don't remember those exact words being used.  There was discussion regarding ... all four applicants, and at that time the three remaining applicants as to the selection of the white female over the black females, yes.
>
> Q:   What was that discussion?
>
> A:   Regarding making sure that we were following our company policy of hiring the most qualified individual for the job.

[48] According to Higgins, Carter had the least experience of all four candidates for the Oxford Complex position and did not meet the position's minimum requirements described by Schaeffer.

21

complaint about the Oxford decision.  The email read:[49]

> I would like to request a meeting with each of you to discuss the decision
> made concerning the Oxford HR Complex position.
> I am officially filing a complaint because I feel that I have been wrongfully
> denied this position.  Please let me know if I need to do anything else to
> officially file this complaint.
> I would like a written explanation as to what criteria was used in making this
> selection and what were the basis [sic] for this decision.
> I would like this meeting to be held ASAP so I will be able to determine if other
> avenues need to be taken to rectify this injustice.
> Your expedient cooperation in this matter will be greatly appreciated.

According to Higgins, no one told her that Carter had been offered the job and turned it

down.  The next day, Higgins met with Schaeffer to discuss the selection of Burdick.  During the

meeting, she told Schaeffer that she was highly upset about the decision.  According to Higgins, she

told Schaeffer that she had been wronged before.  Schaeffer told her that he hoped that the issue

could be resolved.  According to Higgins, Schaeffer told her on this occasion that he did not believe

that Burdick was the most qualified candidate.  Higgins confirmed that the issue could be resolved

by removing Burdick from the position and placing her in it.  Higgins and Schaeffer did not reach

a resolution during this meeting; Higgins told him that she would proceed to the next level.

According to Higgins, Tyson conducted a "formal documented investigation" into Higgins's

complaints only after she complained to numerous management officials.  Plaintiff asserts that no

documents exist from this investigation, although Carter testified that she spoke to Ms. Clark-

Johnson[50] around September or October 2000 and that it is possible that Ms. Clark-Johnson took

---

[49] The email complaint made no reference to race, age, or sex discrimination.

[50] This court notes that Ms. Clark-Johnson is currently assistant vice president of
employment compliance with Tyson.  Prior to that position, she was vice president of diversity
from September 2000 to September 2001.  Prior to that position, she was Director EEO/AA from
July 1997 to September 2000.

notes. Ms. Clark-Johnson did not recall taking written notes and instead stated that she kept "mental notes" as to her investigation which she reviewed. Peggy Roles,[51] as a Divisional Human Resources Manager, stated that she understands that a general investigation is normally completed in two weeks, but sometimes there are circumstances that take longer than that.  For instance, Roles testified, the longest investigation she's had took roughly three months.  Here, Higgins alleges, it took two months to begin an investigation into Higgin's claims of discrimination.

On or around August 15, 2000, Pittard and Schaeffer together met with Higgins to discuss the promotion decision.  Pittard shared with Higgins his matrix categories and results.  Pittard further informed Higgins that he based his decision on the rankings, his knowledge of the candidates, and references.  He also reviewed the rankings with Higgins.  According to Higgins, this meeting was the first time she was told that Jacinta Carter had originally been selected for the position.  When the meeting was over, Higgins told Pittard that she disagreed with the decision and asked him the next person in management to whom she could take her complaint.  Pittard referred her to Serrano.

On August 31, 2000, Higgins spoke with Serrano about her concerns over the Burdick promotion.  As Assistant Vice President of Food Service HR Operations, Serrano had the power to

---

[51] Peggy Roles ("Roles") is a Director of HR operations for Tyson in the food service division.

Under Tyson's policies, Roles testified, an investigation begins with a complaint and follows with witnesses being interviewed and statements provided, with everyone signing off on their statement.  The accused is questioned and his/her statement taken.  Once all the interviews are completed, a summary of the facts are written, and a decision is made whether there has been harassment or discrimination.  An investigator, Roles stated, would also advise the complainant of the findings and any disciplinary action.

Roles further stated that within a couple of days of receiving a complaint, an investigation should begin into that complaint.  Roles testified that there is no doubt that Higgins complained in order to trigger an investigation.

veto Pittard's selection for the position.  According to Serrano, he told her that Pittard had explained to him why Burdick was selected.  He also told her that the decision had been made and Burdick could not be pulled out of the position.

Following her discussion with Serrano, Higgins emailed Clark-Johnson (an African-American female) that same day and stated that although she had spoken with Serrano and several others, she was "still convinced that this was a gross injustice."  She then requested that Clark-Johnson "look into this matter" and "let [her] know, as soon as possible, corporate's position on this matter."

## VIII.   Tyson's Investigation into Higgins's Complaint

After receiving Higgins's complaint, Clark-Johnson alleges that she notified Michelle Eisner ("Eisner"), Senior Vice President, Human Resources, and told her she (Clark-Johnson) would investigate.  On September 22, Clark-Johnson spoke with Higgins and arranged to meet with her on September 29, 2000.  Prior to that meeting, Clark-Johnson requested that Higgins complete a set of questions regarding her complaint.  Higgins complied and submitted her responses prior to meeting Clark-Johnson.

During the course of her investigation, Clark-Johnson interviewed Higgins, Hithon, Pittard, and Trotter.  Clark-Johnson also reviewed the personnel files and resumes of the three remaining candidates for the Complex HR Manager position.  When Clark-Johnson interviewed Higgins, Higgins expressed that she was hurt by the decision that was made and that she felt that she was the most qualified candidate and should have been selected.

During Pittard's interview, he told Clark-Johnson that all of the candidates were good and that Carter had been offered the position but declined it.  Pittard expressed disappointment that

24

Carter did not accept the position and further explained that he selected Carter because he felt that she met the requirements he was seeking in the Oxford Complex HR Manager. Pittard also stated that once Carter declined the position, he felt that Burdick was the best of the remaining candidates as she had done a very good job as Ashland's HR Manager and the quality of her work was good.

**IX.    Tyson's Decision to Review the Promotion Decision: The Review Panel**

After Clark-Johnson reported the substance of her interviews to Eisner, Eisner instructed her to coordinate a panel review of the promotion decision. Clark-Johnson had discretion to determine the number of panelists and to select the individual panelists. Eisner further instructed her to get a diverse group to participate on the panel and to engage an outside firm to assist in the review process.

In determining the makeup of the panel, Clark-Johnson testified, she looked at corporate human resources directors and selected a diverse group of candidates. She selected division HR Managers Leonard Parks ("Parks") (African-American male) and Peggy Roles ("Roles") (white caucasian female).[52] Clark-Johnson also selected David Mantooth ("Mantooth"), VP of Operators (Native-American male)[53] and Eugene Eggman ("Eggman"), another divisions HR Manager (white male).[54] In preparation for the review, Clark-Johnson provided the panelists with the candidates'

---

[52] Roles understood the experience qualification on the job summary to mean three to five years of HR management or related experience. In July 2000, Burdick had three years of HR experience while Higgins had eleven years and Hithon also had more than Burdick.

[53] According to Higgins, Mantooth was Pittard's direct supervisor. Mantooth had received copies of emails and letters from Higgins which complained about Pittard's discrimination in the selection of Burdick.

[54] According to Parks, Eggman said during the process that the ability to relocate was a criteria he felt was important for the position and should be applied to disqualify Higgins. Parks confirmed that this criteria has applied in other locations to the complex human resource

names and a description of the Complex HR Manager position.  According to Parks, he knew prior

to the interviews that there were complaints about Burdick receiving the position.  He couldn't recall

how he heard that information and he didn't understand that race was the issue at the time.

All the panelists knew that Burdick had been in the position for five or six months.  Burdick

told the interviewers she had been in the position for five months and utilized that experience in

responding to questions during the process.  Each of the candidates was asked "what would you do

if you got the position?"[55]

Tyson engaged Fortune Personnel Consulting, a firm based out of Huntsville, to facilitate the

review process.  David Harris ("Harris"), President of Fortune, was specifically responsible for

overseeing the review.  When Clark-Johnson contacted Harris, she informed him that complaints

were registered by two candidates who were denied a position and that the company wanted to re-

examine the process.

On November 14, 2000, Clark-Johnson notified Higgins that her second interview (as part

of the review) for the Oxford position would take place on Thursday, November 30, 2000 at 2:00

p.m. at the Holiday Inn Express meeting room in Oxford.  Clark-Johnson further explained that an

interview process called Topgrading (developed by Harris) was going to be utilized and that the

questions were designed to elicit the candidates' assessment of their own competencies in the

following areas: intellectual, personal, interpersonal, management, leadership, and motivational.

Clark-Johnson also notified Higgins of the panelists' names and told her that the entire interview

---

manager position.

[55] While Higgins cites Roles's deposition for the proposition that all the interviewers
knew that Higgins had complained about Burdick receiving the position, the cited pages do not
appear to support that contention.

process should take three and a half hours. Hithon and Burdick also interviewed as part of the panel's review on November 30 and December 1, 2000. The order of the interviews was: Hithon, Higgins, and Burdick.[56] In the midst of the review process, Higgins filed an EEOC charge. *See infra* for text of charge.

## X.  The Re-Interview Process

Higgins, Hithon and Burdick were interviewed as a part of the panel's review on November 30 and December 1, 2000.

Hithon's interview, the first one, started at 8:30 a.m. Higgin's interview started at 2:00 p.m. Harris explained to Higgins at the beginning of her interview that he would ask the questions and that the panelists would take notes as she responded. The Higgins interview lasted between two and three hours. At the end of each candidate's interview, Roles testified, the panelists discussed the interview. Burdick was interviewed on December 1, 2000.

Prior to the interviews, the panelists met with Harris, the facilitator, who discussed with them the interview process and the questions that would be posed. Each panelist was also given a copy of the candidates' resumes to review before their interviews. In addition, before the interviews, Harris informed the panel that although Burdick had been in the position since July, it was the panel's charge to make the best selection for the position and that whomever the panel selected would be placed in the position. Harris told the panel that their job was to "second-interview these individuals as if this position had never been filled." The individual candidates were not discussed among the panel members prior to the interviews.

---

[56] Carter was not included in the second interview process, and Schaeffer said he didn't know why. Roles stated that she had been told by David Harris that only the top three candidates were re-interviewed.

During the interviews, each candidate was asked the same questions. Harris asked the majority of the questions and occasionally one of the panelists would ask a follow-up question for clarification or elaboration. At the end of each candidate's interview, Harris led a discussion where the panel reviewed their opinions of the candidate's strengths and weaknesses. After the interviews, each panelist had ranked the candidates in the following manner. Mantooth picked Burdick (1), Higgins (2), Hithon (3); Roles selected Burdick (1), Higgins (2), Hithon (3); Eggman chose Burdick (1), Higgins (2), Hithon (3); and Parks picked Higgins (1), Burdick (2), Hithon (3).[57]

## XI.   **The Panel's Recommendation**

After the interviews were completed, the panelists formulated a summary of the candidates' strengths and weaknesses based on the interviews. The panel ultimately recommended Burdick as "the candidate who best fits the Oxford Complex HRM position." Sometime before Christmas, Harris contacted Higgins and informed her that Burdick had been selected to remain in the position.

While defendant indicated the panel recommendation of Burdick was unanimous, Higgins alleges, Parks testified that each panelist made a separate recommendation. He thought Eggman

---

[57] In his deposition, Parks stated that while he believed that Higgins and Burdick were equally qualified, he believed that Higgins should have been the successful candidate because of her seniority and not knowing what was in their personnel file. Parks stated that he recommended plaintiff based on her qualifications, experience, creativity, job knowledge, and the interview process. Parks asked to review personnel files of the three candidates and was denied. Roles, who was one of the interviewers for the second interview process and was a director of human resource operations, also asked to review personnel files and was denied.

Furthermore, Parks stated that he did not know who the other individuals on the panel were recommending when he left the meeting. Parks made his recommendation within thirty days and sent it to Eggman. In his email, he recommended Higgins, stating that he knew relocation was important in some cases, but not every case, and using the analogy that Burdick was a junior co-team player that one day would have the ability to be a starter, but that Higgins, based on her experience, the interview, and seniority, should be promoted.

collected all the recommendations and someone else was to "make another decision or review the information." Parks testified that he was unsure who the final decision maker would be. According to Parks, the panel's consensus was that Higgins came across very well in the interview, had job knowledge, and had longevity. By Parks's account, Burdick's strength was creativity and ability to relocate. Parks allegedly made no recommendation what the unsuccessful candidates' positions should be within Tyson and was not told that was part of the panelists' duties. Parks was never told there would be a follow-up meeting with Higgins about her interview and developmental needs, and Parks made no recommendation regarding what position Higgins should be selected for. Prior to leaving the second interview process, no decision had been made as to who would go into the position held by Burdick, and Parks understood it would be taken under advisement.

## XII.   January 2001 - Present - Higgins's Employment Path

Higgins received a promotion to Division Training Manager for the Refrigerated and Deli Division in January 2001, after the second interview for the Oxford Complex Manager. Higgins was promoted to the same grade as a Complex HR position. Higgins is still paid less than Burdick by $20,000, although they are both in the same grade. Carter also makes $20,000 more than Higgins. Carter and Burdick are at the complex level. According to Parks's deposition (pp. 55-56), an employee at the division level should make more money than a complex employee. Higgins is now responsible for two training centers: Oxford, Alabama, and Wilkesboro, North Carolina as of 2003. Higgins travels 50 percent of her time to various Tyson locations with the Retention Program or the Training Center.

## XIII.   Procedural History

On November 7, 2000, Higgins filed an EEOC charge of discrimination, alleged race, sex,

and age discrimination.[58]   On July 25, 2002, Higgins filed the instant complaint against Tyson

alleging unlawful employment practices and race, gender, and age discrimination.[59]   The complaint

contained the following counts: Count One (Racial Discrimination)[60]; Count Two (Section 1981)[61];

---

[58] The EEOC charge alleged that the earliest date of discrimination was 5/20/00.   It further alleged:

> My name is Ever Higgins. I am a black female over the age of 40. I am currently the Southeast Division Training Manager. I took the position on June 15, 1998. I started the process of trying to get a raise in approximately January, 1999. I had previously been told when I took the training position that I would be eligible for a raise after six months. My previous supervisor, Clarence Wilson, a black male, recommended me for a raise after six months. In May, 2000, the white male supervisors over me denied me the raise stating that I was already making to much money in the position.
>
> Thereafter, in June, 2000 I applied for the Complex Human Resource position, which would have been a promotion for me. There were three black applicants and one white applicant for the position. The white female applicant, who had considerably less experience and time with the company, was awarded the position. I have 24 years experience with Tyson and I have 15 years experience in management and have never been disciplined or reprimanded. It is my opinion, that I have been denied a promotion and raise due to my age, over 40, and my race, black. Other similarly situated have also been discriminated against.

[59] Plaintiff seeks back pay, front pay, compensatory, liquidated and punitive damages, as well as attorneys' fees and costs.

[60] Count One alleged: "Plaintiff was qualified to receive a promotion and raise but was treated less favorably and paid less in comparison to her white co-workers due to her race."

[61] Count Two alleged: "Plaintiff was qualified for a promotion, pay raise and evaluation. Black employees are treated less favorably, promoted less and paid less in comparison to their white co-workers due to their race."

Count Three (Title VII Disparate Impact)[62]; Count Four (Title VII Disparate Treatment)[63]; Count

Five (Age Discrimination)[64]; Count Six (State Law Age Discrimination)(same); Count Seven

(Intentional Infliction of Emotion Distress)[65]; Count Eight (Negligent Hiring, Training, Supervision

and Retention);[66] Count Nine (Conversion)[67]; Count Ten (Willful Misrepresentation)[68]; Count Eleven

---

[62] Count Three alleged: "There is an imbalance in the racial and gender make-up of Defendant's upper level management. There is an exclusion or mistreatment of a disproportionate number of a protected group. There is a cause and effect relationship between the racial imbalance in the employer's management and unlawful employment practices."

[63] Count Four alleged: "Black employees, and specifically black female employees, are treated less favorably and paid less in comparison to their white co-workers due to their race, black."

[64] Count Five alleged: "Plaintiff is over forty years of age and a member of a protected class. Plaintiff was qualified to perform the job duties of the Complex Human Resource Manager. Plaintiff was denied the position and a younger applicant with less experience and seniority was awarded the position."

[65] Plaintiff's response states that she voluntarily dismisses count 7.

Count Seven alleged:
The conduct of the defendants' employees, as aforesaid, was extreme, outrageous and beyond the boundaries of decency. Such conduct created a hostile work environment that was unwelcomed by the plaintiff, altered the plaintiff's working conditions and should not go unpunished. The intentional acts of harassment and intentional conspiracy toward Plaintiff by the defendant's employees, and the subsequent ratification by the Defendant, altered the plaintiff's work environment. Defendant's failure to implement its policy on discrimination in the work place and managers'/supervisors' conduct and standards proximately caused Plaintiff to suffer severe emotional distress, mental anguish, embarrassment, humiliation and trauma for which she claims damages.

[66] Plaintiff's response states that she voluntarily dismisses count 8.

[67] Plaintiff's response states that she voluntarily dismisses count 9.

Count Nine alleged: "Defendant wrongfully and falsely converted the labor of the plaintiff by promising the plaintiff more money if she accepted the position for which defendant sought to promote the plaintiff. The plaintiff satisfactorily delivered to the defendant the work

(Fraud in the Inducement)[69]; Count Eight (Breach of Contract)[70]; and Count Twelve (Breach of

Implied Covenant of Good Faith and Fair Dealing).[71]   In her response, after noting that she

_____

product the defendant demanded but defendant withheld the promised payment."

[68]      Plaintiff's response states that she voluntarily dismisses count 10.

        Count Ten alleged: "Defendant wrongfully and falsely misrepresented to the plaintiff the job position for which plaintiff applied and accepted.  Defendant willfully misrepresented material facts to induce the plaintiff to act to her detriment."

[69]      Plaintiff's response states that she voluntarily dismisses count 11.

    *See supra* note 9.  Additionally, plaintiff alleged: "Further the defendant wrongfully and falsely converted the labor of the plaintiff by promising the plaintiff more money if she accepted the position for which defendant sought to promote the plaintiff.  The plaintiff satisfactorily delivered to the defendant the work product the defendant demanded but defendant withheld the promised payment."

[70]      Plaintiff's response states that she voluntarily dismisses the second count eight (breach of contract).

        This count was mislabeled "Count Eight."  The court will refer to it as the "second Count Eight."  The second Count Eight alleged:

            Defendant has represented to Plaintiff in various writings, including but not limited to, personnel policies and procedure manuals, retirement and profit-sharing plan and employee guidelines, that the employment relationship would be based on good faith, that employees would be treated fairly and equitably, that employees would be judged on the basis of individual merit and ability, and that employees would receive just compensation for services rendered to the defendant.

According to Plaintiff, these provisions form part of the express employment contract, which was breached by Defendant in July 2000 by "wrongfully fail[ing] to judge plaintiff on the basis of merit and ability and wrongfully and without just cause den[ying] the plaintiff the position of Complex Human Resource Manager by committing deliberate acts of discrimination and unfair dealing."

[71] Plaintiff's response states that she voluntarily dismisses count 12 (breach of implied covenant).

voluntarily dismisses count 7-12, *see supra* footnotes, plaintiff states that her remaining claims relate to her claims of race and age discrimination as to the denial of the Oxford Complex human resource manager position. She states: "Plaintiff voluntarily dismisses her claim alleging discrimination when she was wrongfully denied a six month review and raise for the promotional decision to the Southeast training manager position."

### SUMMARY JUDGMENT STANDARD[72]

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to

--------------------------------------------

[72] Regarding the legal standard for summary judgment in employment discrimination cases, plaintiff's counsel argues that *Desert Palace v. Costa*, 123 S. Ct. 2148 (2003) should govern and that the recent case eviscerates the *McDonnell-Douglas* test. Identical arguments have been made by plaintiff's counsel in a previous case before this court, so this court will not set them forth in detail here. *See* Memorandum Opinion in *Tracy O'Neal v. Tyson*, 1:03cv2191 (7/19/04).

Defendant opposes plaintiff's arguments in this regard, citing *Sanders v. City of Montgomery*, 2004 U.S. Dist. LEXIS 100000, *47-48 (M.D. Ala. 2004) and *Herawi v. Alabama Dept. of Forensic Sciences*, 311 F. Supp. 2d 1335, 1345 (M.D. Ala. 2004) for the contention that the *McDonnell-Douglas* framework has not been eviscerated by *Desert Palace*.

33

evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

I.    **Defendant's Motion**[73]

A.    **HIGGINS'S AGE AND RACE-BASED PROMOTION CLAIMS CANNOT SURVIVE SUMMARY JUDGMENT.**[74]

---

[73] In plaintiff's response brief, she voluntarily dismisses Counts VII through XII involving intentional infliction of emotional distress, negligent hiring/training/supervision, conversion, willful misrepresentation, fraud in the inducement, breach of contract, and breach of the implied covenant of good faith and fair dealing. Additionally, Higgins voluntarily dismisses her claim alleging discrimination based on the alleged denial of a six-month review and raise for the promotional decision to the Southeast training manager position.

According to Tyson, this court's order dismissing all the claims listed above "should explicitly include dismissal of the claim for Plaintiff's alleged denial of a six month review."

[74] According to Tyson, the *McDonnell Douglas* framework applies to claims of discrimination under the ADEA as well as Title VII. *See Reeves v. Sanderson Plumbing Prods,*

34

Higgins alleges that she was subjected to discrimination based on race and age when she did not receive the promotion to Oxford Complex HR Manager in July 2000. Specifically, she alleges: "Despite ... twenty-four years of service and fifteen years of management experience with defendant, plaintiff was denied the promotion while the younger white female applicant with six years of service and less experience was awarded the position." *See* Compl. ¶ 17. The complaint further alleges that Higgins was "qualified to receive a promotion ... but was treated less favorably" and "was denied the position and a younger applicant with less experience and seniority was awarded the position." *Id.* at ¶¶ 21, 45 & 52.

"To establish a prima facie case of Title VII [race] or age discrimination in a promotional decision, a plaintiff must prove: (1) that [she] is a member of a protected minority; (2) that [she] was qualified and applied for the promotion; (3) that [she] was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249 (11th Cir. 2000)(emphasis added)(citing Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999)). Tyson describes the *McDonnell Douglas* burden-shifting framework, with which this court is very familiar.

"In a failure to promote case, however, a plaintiff cannot prove pretext by simply arguing or even by showing that [he] was better qualified than the [person] who received the position [he] coveted." *Alexander v. Fulton Co.*, 207 F.3d 1303 (11th Cir. 2000).[75] "Rather, [the plaintiff] must

---

*Inc.*, 530 U.S. 133, 141-42 (2000); *Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1267 n. 6 (11th Cir. 2001). Thus, Tyson does not analyze separately Higgins's Title VII and ADEA claims but instead relies on the same legal arguments presented in this brief as to Higgins's promotion claim.

[75] "A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [race]." *Lee*, 226 F.3d at 1253 (citation omitted).

adduce evidence that the disparity in qualifications is `so apparent as virtually to jump off the page and slap you in the face'." Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (llth Cir. 2001) (citation omitted).  For the discrepancies to "jump off the page and slap you in the face," Tyson argues, they must be of such weight and significance that no reasonable person could have chosen the other candidate over the plaintiff.  *See Lee,* 226 F.3d at 1254.

Tyson cites the Eleventh Circuit's assessment of the court's limited role, i.e., "to prevent unlawful hiring practices, not to act as a super personnel department' that second-guesses employers' business judgments." *Id.* (citation omitted).  *See also Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions.").

This court, Tyson argues, thus must determine not "whether the employer selected the `most' qualified candidate, but only whether it selected the candidate based on an unlawful motive." *See Denney*, 247 F.3d at 1188.

1.     **With Regard to the Race Claim, Higgins Cannot Satisfy Her Prima Facie Burden as an African-American Woman, Jacinta Carter, Was Selected for the Position**.

It is undisputed that Jacinta Carter, an African-American female, was originally offered the Oxford Complex HR Manager position. (Pittard Depo. pp.172, 174-75, 242.)  According to Tyson, after having interviewed the candidates, spoken to their respective references, and ranked the candidates in the matrix, Pittard decided that Carter was his choice for the position. (Pittard

depo.p.120). Upon reaching this conclusion, Pittard called Carter and extended the offer to her on July 14, 2000. (Pittard Depo. pp. 172; 232). According to Tyson, this fact defeats Higgins's attempt to establish a prima facie case of race discrimination. Carter stated that she considered the offer to be genuine. (Carter Depo. p. 50; Carter Decl.¶ 9).

According to Tyson, Higgins cannot offer evidence that the offer was disingenuous or that Carter was forced or unduly persuaded to accept the Pine Bluff position over the Oxford position. Although the position was ultimately awarded to Burdick, a white female, Tyson contends, this fact does not negate that Pittard's first choice for the position was Carter, a black female. By defendant's account, Carter's decision not to take the job should not prejudice Tyson.

> **a.     Higgins Cannot Establish that Any Disparity Between Her Qualifications and the Qualifications of the Selected Candidates (Carter and Burdick) Is So Great That No Reasonable Person Would Have Selected Either Carter or Burdick.**

To support Higgins's assertion that she was more qualified than Carter, Burdick and Hithon, Higgins contends that she had been with the company longer and had more experience in Human Resources. Tyson does not dispute those facts. However, Tyson argues, those were not the only factors upon which the promotion decision was based. Once all of the factors are taken into account, Tyson argues, Pittard's reasons for selecting Carter and Burdick over Higgins (and Hithon) are legitimate and compelling.

Pittard ranked the candidates in nine categories based on their resumes, interviews and references. (Pittard Decl.¶8).[76] Pittard's chart demonstrates the following: Carter was ranked first in five out of the nine categories that Pittard factored into his decision. Both Burdick and Higgins

---

[76] Defendant provides a chart of this ranking, which the court has considered.

received two "1" rankings; Hithon did not receive a first place ranking in any of the categories. Carter received two "2" rankings while Burdick received six "2" rankings. Both Higgins and Hithon received one "2" ranking. Carter and Burdick both had one rating of "3" while Higgins had three such ratings and Hithon had five. Burdick did not receive any ratings of "4" but Carter did receive one "4" rating. Higgins and Hithon both received three ratings of "4."

After ranking the candidates, Tyson alleges, Pittard concluded that Carter was the most qualified for the position for a number of reasons, including the following facts: she had a double major college degree; she was bilingual; she had great successes in her current plant; she had strong references; she was willing to relocate to the area; she exhibited a high degree of enthusiasm and motivation for the job; and she interviewed extremely well. During her interview Carter gave specific answers to Pittard's questions and gave descriptions of programs that she initiated in her current role as Plant HR Manager. (Id. p.120-21). Pittard also felt that Carter was innovative because she developed solutions to tough problems. (Id. p.121). He was also impressed that, of all the candidates, she asked him the most questions. (Id. pp.125-26).

Other than her seniority with the company and her greater number of years in Human Resources, Tyson argues, Higgins's qualifications did not match or exceed Carter's. Tyson points to the following: Higgins has only one major with her college degree (PX1); She is not apparently bilingual. (Pittard Decl.¶10); Higgins's references were not as strong as Carter's. (Id.) Furthermore, Tyson contends, Pittard found that Carter demonstrated more poise and presence during the interview than the other candidates.

Once Carter declined the position, Pittard selected his second choice, Burdick, for the position. (Pittard p.103). Pittard allegedly selected Burdick because she was successful in her job

38

and "had a good track record." (Id.)  She also had a college degree and displayed a high degree of

enthusiasm and heavy involvement in the Calhoun County community. (Id.)  Also, Pittard stated,

Burdick received good references. (Id. pp. 103-14).

According to Pittard, he did not select Higgins for the position because she had been out of

Human Resources for over two years at the time she sought the position (Pittard p.137) and she did

not demonstrate the same initiative as Burdick. (Pittard Decl.¶10).  Furthermore, Pittard stated, of

all of the candidates, Higgins received the poorest references with regard to her relationship with the

union. (Id.) Pittard also assessed Higgins to have the lowest level of community involvement of the

candidates.  Defendant also attaches an altered chart which reflect the rankings of the candidates as

if Carter were not a candidate (once Carter declined the position).

In order to satisfy her burden, Tyson asserts, Higgins must show a disparity so great that a

reasonable juror could only infer discriminatory intent from the comparison.  *See Lee,* 226 F.3d at

1255. According to Tyson, it is insufficient for Higgins to demonstrate that she was in fact the most

qualified person for the position.  *See Cofield* at 1264 (11th Cir. 2001).  Instead, Tyson asserts,

Higgins must show that only discriminatory intent could have led to someone else receiving the

position (which she cannot).  *See Id.*  Based on Pittard's rankings, defendant notes, both Carter and

Burdick received more "1" and/or "2" ratings than Higgins and Hithon.  Additionally, Tyson alleges,

both Carter and Burdick received better references than Higgins.  Furthermore, Tyson argues, Pittard

concluded that Higgins had the lowest level of community involvement of the candidates.  Of all of

the categories considered, Higgins only received higher rankings than Burdick and Carter in the

"Total HR Management Experience" and "Total HR Experience."  In  the remaining seven

categories, Tyson alleges, either Carter or Burdick are ranked number one. Based on this evidence,

Tyson contends, Carter and Burdick were more qualified or at least were equally qualified as Higgins for the position.

### b. Assuming that Higgins Could Satisfy the Prima Facie Elements of the Promotion Claim, She Cannot Establish Pretext.

#### a. No evidence of racial animus.

In Higgins's deposition, she stated that she did not recall hearing Pittard say anything at any time that was racially biased against African-Americans or that was sex- or age-biased.  Clearly, Tyson argues, Higgins is not basing her beliefs about Pittard on comments that he has made.  When asked why she believes that Pittard has race-negative attitudes, Higgins responded: "I think if you examine his hiring practices, they speak for themselves. Under Mr. Pittard, he would promote you so far; but then after you reach a certain level, you will not go any further if you fell in the minority category." (Higgins p.451).  On the contrary, Tyson emphasizes, Pittard approved the assignment of Clarence Wilson, a black man over age 40, to Oxford Complex HR Manager, the very position at the heart of this case, and then selected Jacinta Carter, a black woman, to replace Wilson. (Pittard Decl.¶¶ 3,11). This is substantial evidence of a lack of racial animus on Pittard's part.[77]  According to Tyson, Higgins's mere belief that Pittard holds race-negative attitudes is insufficient to demonstrate racial animus.

#### b. No evidence of age-based animus.

---

[77] According to Tyson, even assuming that Pittard had not awarded a promotion to an African-American candidate, this fact would not establish racial animus. During her deposition, Higgins was asked whether she had ever filled a vacancy with a Hispanic, to which her response was, "No." (Higgins pp.499-500). When then asked if the fact that she had not filled a position with a Hispanic would be indicative of any animus against them, she said that it would not. (Higgins p.501). Thus, Tyson contends, Higgins acknowledges that the number of vacancies filled by a minority candidate does not necessarily indicate a decision-maker's animus.

Higgins testified that Pittard told her that he selected Burdick "because of her energy level and because she knows the mayor" and that she considered that comment to be age-negative. (Higgins pp.337;453-454). Higgins admitted that this was the only age negative comment that she could recall him making and that she could not recall anyone else telling her of any age negative comments that he made. (Higgins p.454).[78]

Pittard's alleged comment and reliance on energy as a criteria, defendant argues, are insufficient to establish pretext.  Tyson relies on *Chapman v. A.I. Transport*, 229 F.3d 1012 (11th Cir.2000), in which plaintiff alleged that he was denied a promotion because of his age.  In an effort to demonstrate pretext, the *Chapman* plaintiff proffered a statement by one of the decision-makers that he was unimpressed with Chapman in part because he was not aggressive in answering questions during the interview. *See Chapman* at 1035-36.  However, Tyson notes, the Eleventh Circuit refused to equate aggressiveness as a hiring trait to age bias or as highly suspicious, stating:

> Just because a sought after trait is linked by stereotype to an impermissible consideration does not mean an employer cannot search for and consider the trait itself independently from the stereotype. For example, according to stereotype women are not as physically strong as men. If an employer is hiring people for positions that require a great deal of physical strength, it would be permissible for the decision-makers to hire a man instead of a woman if that particular man has more physical strength than that particular woman, even though the decision could not be based on the stereotype about the comparative physical strength of men and women in general.

Id.

Here, defendant argues, Pittard considered motivation/energy as a factor because he was looking for a Complex HR Manager whose enthusiasm would serve as an example to the employees

---

[78] Tyson points out that Higgins and Hithon were the first employees to file an internal complaint against Pittard alleging discrimination based on membership in a protected class. (Clark Decl.¶9).

41

in the plants. (Pittard Decl.¶9). Pittard also was looking for a self-starter who would take charge of situations and generate positive opportunities and relationships for Tyson in the Oxford/Anniston area. (Id.) According to Tyson, Higgins has not presented any evidence to dispute those facts, such as evidence that Pittard evaluated the candidates based on stereotypes or preconceived notions of the amount of energy that people over forty may or may not have.

### c.   Subjective criteria, standing alone, are not sufficient evidence of pretext.

Tyson deems meritless any assertion by Higgins that the criteria utilized during the original decision-making process or during the panel review were overly subjective, again relying on *Chapman, supra*:  "We begin with an important threshold: A subjective reason can constitute a legally sufficient, legitimate, non-discriminatory reason under the McDonnell Douglas/Burdine analysis. Indeed, subjective evaluations of a job candidate are often critical to the decision-making process, and if anything, are becoming more so in our increasingly service-oriented economy. ...Attitude, articulateness, and enthusiasm, as well as appearance, can be vitally important ... yet there are few if any ways to gauge such qualities objectively or from a written application." *See Chapman* at 1033.  The *Chapman* court acknowledged that "personal qualities also factor heavily into employment decisions concerning supervisory or professional positions."[79]  *Id.*  Furthermore, the *Chapman* court found:  "To phrase it differently, subjective reasons are not the red-headed stepchildren of proffered non-discriminatory explanations for employment decisions. Subjective reasons can be just as valid as objective reasons." *Id.* at 1034.

According to Tyson, Higgins lacks evidence that either Pittard or the panel utilized subjective

---

[79] Defendant provides string citations in addition to *Chapman*, which this court has considered but does not list here.

criteria that were based on race or age.  Defendant repeats facts regarding Pittard's ranking process

and subjective beliefs about Carter and then Burdick.  Turning to the panel, Tyson argues, the panel

submitted a seven-page report that articulated the panel's assessment of each candidate's strengths

and weaknesses and concluded that Burdick was the best candidate for the position. (DX47 to

Higgins Depo.).  As required by *Chapman*, Tyson asserts, it has offered "clear and reasonably

specific" explanations for why it reached the subjective conclusion to place Burdick in the Oxford

Complex HR Manager position.  To the extent Higgins is asking this Court to second-guess Tyson's

employment decisions, Tyson asserts, this court should not do so. *See Elrod v. Sears, Roebuck & Co.*

at 1470 (11th Cir. 1991).  Tyson summarizes plaintiff's complaint as a beef with Pittard's and the

panel's assessments of her qualifications as compared to Ms. Carter and Ms. Burdick.

### C.    HIGGINS'S DISPARATE IMPACT CLAIM CANNOT SURVIVE SUMMARY JUDGMENT.

In her complaint, Higgins alleged "an imbalance in the racial and gender make-up of

Defendant's upper level management," exclusion or mistreatment of a disproportionate number of

a protected group," and "a cause and effect relationship between the racial imbalance in the

employer's management and the unlawful employment practices." *See* Compl. ¶¶ 33-34.

### 1.    Higgins's Disparate Impact Claim Must Fail Due to Higgins's Failure to Exhaust Administrative Remedies.

#### a.    Title VII Analysis.

Defendant reiterates that filing an EEOC charge is a mandatory administrative prerequisite

to bringing suit under Title VII. *See* 42 U.S.C. § 2000e-5(e).  With regard to the relationship

between an aggrieved party's EEOC charge and any subsequent judicial complaint, Tyson notes, the

"judicial complaint is limited to the scope of the administrative investigation which could reasonably

be expected to grow out of the charge of discrimination." *See Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir.1985).  "Absent some allegation of fact sufficient to put the defendant on notice of the nature and scope of the claim against it, the plaintiff is barred from asserting other types of claims in subsequent judicial proceedings that may bear some connection, however distinct, to the bare claim asserted in the EEOC charge." *Murray v. John D. Archibold Mem. Hosp.*, 50 F.Supp.2d 1368, 1380 (M.D.Ga. 1999).

According to Tyson, Higgins did not allege disparate impact in her EEOC charge and has effectively conceded that her EEOC charge is limited to her claims regarding denial of a six-month review/raise in June 1998 and a denial of a promotion in July 2000. (Higgins pp.427-428).  While the last sentence of the charge stated that "other [sic] similarly-situated have been discriminated against," Tyson argues, this statement does not represent sufficient notice of Higgins's intent to allege disparate impact.  Furthermore, Tyson argues, the EEOC must not have considered it sufficient notice, as nothing in the Commission's determination letter of July 2, 2002, mentions anything about any allegations of disparate impact. (DX50 to Higgins Depo.).  Additionally, defendant asserts, there is no evidence that Higgins raised such a claim during the course of the Commission's investigation.  As Title VII disparate impact was not previously raised in the EEOC charge or during the course of the EEOC's investigation, Tyson argues, Higgins failed to satisfy all of the conditions precedent to filing a Title VII suit, mandating dismissal of plaintiff's Title VII disparate impact claim.[80]

---

[80]  See <u>Murray</u> at 1381-82 (holding that plaintiff's EEOC charge of race discrimination with respect to herself did not include plaintiff's disparate impact claim, resulting in the dismissal of her EEOC administrative remedies-"The undisputed facts in the record show that the EEOC investigated her charge of race discrimination only with respect to her application for employment, rather than with respect to the potentially disparate impact the weight policy may have upon black applicants.")

44

### b.    §1981 Analysis.[81]

According to Tyson, Higgins has not identified a neutral policy that has had a disparate impact on African-American employees in the relevant time period. In fact, Tyson urges, the only "policy" that Higgins mentions in this count is Tyson's alleged "unlawful intentional discrimination," which is more akin to an allegation of disparate treatment than disparate impact.

### 2.    Assuming that the Disparate Impact Claim Was Not Due to Be Dismissed on Procedural Grounds, This Claim Remains Due for Dismissal for Lack of a Prima Facie Showing of Discrimination.

Disparate impact discrimination "prohibits neutral employment practices which, while non-discriminatory on their face, visit an adverse disproportionate impact on a statutorily-protected group." *EEOC v. Joe's Stone Crab, Inc.*, 220 F. 3d 1263, 1274 (11th Cir. 2000)(*citing Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). "Congress has codified the appropriate burdens of proof in a disparate impact case in 42 U.S.C. § 2000e2(k)(1994), and a settled jurisprudence has arisen to implement the methodology." *In re Employment Litig. Against the State of Ala.*, 198 F. 3d 1305, 1311 (11th Cir. 1999).

According to Tyson, a prima facie case of disparate impact race or sex discrimination has three elements: "first, that there is a significant statistical disparity between the proportion of [the protected class] in the available labor pool and the proportion of [the protected class] hired; second, that there is a specific, facially-neutral employment practice which is the alleged cause of the disparity; and finally, . . . that a causal nexus exists between the specific employment practice

---

[81] Based on the recent Supreme Court decision, *Jones v. Donnelly & Sons Company*, 125 S. Ct. 1836 (2004), Tyson concedes that the statute of limitations for section 1981 claims is four years, thereby rendering plaintiff's section 1981 claim timely.

identified and the statistical disparity shown." *See Joe's Stone Crab* at 1274.[82]

To surmount the first hurdle in a disparate impact race or sex discrimination case (causation), defendant argues: "Plaintiff must offer statistical evidence of a kind and degree to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)(emphasis added); *see also Edwards v. Wallace Community College*, 49 F. 3d 1517, 1520 (11th Cir. 1995)(observing that a "plaintiff must identify a specific employment practice that leads to disparate impact.").

Tyson alleges that Higgins has failed to establish <u>any</u> element of a prima facie case of disparate impact race or sex discrimination. First, Tyson contends, there is no statistical evidence at all much less evidence of a significant statistical disparity between the proportion of African-Americans or women in the available labor pool and the proportion of African-Americans or women promoted by Defendant. Second, Tyson argues, Higgins has not identified a specific, facially-neutral employment practice which is the alleged cause of any disparity. Finally, Tyson asserts, Higgins has failed to establish a causal nexus between any specific employment practice identified and any statistical disparity.

Defendant anticipates that Higgins may offer raw data. However, Tyson argues, even if such

---

[82] Tyson enumerates the parties' respective burdens as follows: Higgins must establish prima facie case of disparate impact race or sex discrimination, at which time the burden of production shifts to the defendant to establish that the challenged employment practice serves a legitimate, nondiscriminatory business objective. *See Fitzpatrick* at 1117. Once the defendant has established that the challenged employment practice serves a legitimate, nondiscriminatory business objective, in order to prevail Higgins must then prove that an alternative, non discriminatory practice would have served the defendant's stated objective equally as well. Id. at 1118.

raw data presented was somehow "statistically significant" (despite the absence of any statistical analysis, theory or timely-designated expert), such data would not be "legally" significant. Defendant argues:

> In other words, even if the data suggests that a given outcome is probably not due to chance, they do not support Higgins's claim that the result is probably due to race or sex discrimination. The information presented by Higgins has no legal significance because it lacks any analytical foundation. Any bare numbers presented by Higgins clearly do not provide a relevant comparison between those occupying these management positions and those truly qualified and eligible for the positions.

Tyson lists cases in which raw data was rejected. *See Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997)("Appellant argues that in the history of Appellee's operations (650 employees in eight plants), there have only been three black supervisory employees. Appellees argue, however, that Appellant has provided no other information (i.e., whether any black employees ever applied for supervisory positions) to make this otherwise anecdotal information significant ... We agree. Statistics without an analytic foundation are `virtually meaningless.'"); *see also Howard v. BP Oil, Inc.*, 32 F.3d 520, 524 (11th Cir. 1994)("[Plaintiff] also argued before the trial court that the fact that BP has no black dealers in the predominantly white areas of north Atlanta was statistical evidence of discriminatory intent. We agree with the trial court that for this fact to be relevant, plaintiff would have had to present evidence as to how many blacks applied and were rejected and evidence of the success rate of equally qualified white applicants. Anecdotal information is no substitute for meaningful statistical analysis"); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 952-53 (11th Cir.) *cert. denied* 502 U.S. 1058 (1992)(evidence that only 2 out of 860 Honda dealers nationwide were black had no significance since "[s]tatistics, such as these ... without an analytic foundation, are virtually meaningless. To say that very few blacks have been selected by Honda does

not say a great deal about Honda's practices unless we know how many blacks have applied and failed and compare that to the success rate of equally qualified white applicants.")

## II.    Plaintiff's Response

### A.    Higgins Can Establish Her Prima Facie Case of Race Discrimination

Plaintiff agrees with defendant that the *Taylor v. Runyon* requirements for a prima facie case, *see supra*, apply.  Plaintiff also agrees that in a failure to promote case, a plaintiff cannot prove pretext simply by showing that she was better qualified than the individual who received the position she wanted, but rather, a plaintiff must show that the employer's mistaken decisions were motivated by race.  *See Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000).  Furthermore, plaintiff argues, courts "are not in the business of adjudging whether employment decisions are prudent and fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."  *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

However, plaintiff contends, evidence that an employer hired a less qualified applicant over the plaintiff may be probative of pretext.  *See Alexander* at 1340; *see also Walker v. Mortham,* 158 F.3d 1177, 1190 (11th Cir. 1998)("'The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.'")(citation omitted).[83]

---

[83] Plaintiff further relies on the law of other circuits in articulating the plaintiff's evidentiary burden regarding pretext. *See, e.g., Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1999)(explaining that the phrase "jump off the page and slap [you] in the face" should be understood that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question); *Simms v. Ok. ex rel. Dept. of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321 (10th Cir. 1999).

1.   **Higgins's Qualifications and Experience Compared to Carter and Burdick Are So Great that They Jump Off the Page and Slap You in the Face.**[84]

Plaintiff repeats facts cited earlier in this memorandum opinion regarding Higgins's lengthy full-time employment history with Tyson versus Burdick's and Carter's much shorter employment record with defendant.  Additionally, plaintiff asserts, Higgins had fifteen years of Tyson managerial experience versus Burdick's 3 and Carter's 2 at the time of the decision to promote Burdick.  Prior to June 2000, Higgins argues, Carter had approximately 1-1/2 years of union experience versus Burdick's 4 and Higgins's 24 (with ten of those years as a bargaining unit member).

Moreover, plaintiff reiterates, Carter's evaluation by her Buena Vista plant supervisor approximately one month before her interview with Pittard noted many standard performance sections and noted criticisms.[85]  On the other hand, Higgins contends, her reviews were glowing: "Ever is adept at human resources functions and quality control and training.  She is a very valuable team member"; "Ever has exceeded this challenge on a consistent basis"; "Given the right opportunity, Ever is ready for a complex H.R. position." *See* Pl. Ex. 5.

Plaintiff repeats facts regarding Burdick's and Higgin's employment history with Tyson.  According to Higgins's deposition, Schaeffer met with her on July 27, 2000 and stated that he did not think Burdick was the most qualified.  Clearly, plaintiff asserts, she was the top candidate, as indicated by her employment history and the recommendations by Trotter and Wilson.  Furthermore, Higgins argues: "When deposed, Carter agreed; Clark-Johnson agreed; Schaeffer agreed; Trotter

---

[84] This court will not restate facts cited earlier in this memorandum opinion.

[85] For more on this performance review, *see supra*.

49

agreed; Wilson agreed."[86]

Again, plaintiff contends, she trained both Burdick and Carter at different points. Furthermore, Higgins alleges, she had been evaluated and told she was ready for a promotion to the position at issue by her supervisor, whereas Burdick had not. Plaintiff further argues: "Trotter and Wilson, in the capacity of Complex HR manager, both recommended Higgins, though Pittard did not inquire until after he made the Burdick decision. A reasonable juror could infer discriminatory intent from the comparison." Clearly, Higgins contends, she has made her prima facie case.

### 2.    The Sham Offer to Carter

At the time Pittard did interviews for the Oxford Complex position, plaintiff alleges, there were three African-Americans and one white female who applied. According to Higgins, Pittard wanted Burdick, the sole white female, in the position, but "manipulated Carter, the least qualified of all candidates, but an African-American as his 'top choice.' He told Carter he was interested in her for the position, but she needed to interview for the Pine Bluff job as well."[87]

---

[86] However, this court notes, plaintiff fails to provide citations to the record for Carter, Clark-Johnson, and Schaeffer. Furthermore, Wilson's supposed agreement is only cited to Higgins's own deposition, and that page does not appear to buttress the cited contention.

[87] As evidence of Pittard's alleged discriminatory motivations, plaintiff relies on an affidavit from Melody Lloyd ("Lloyd"), who served as Plant Human Resource Manager for four years at the Heflin plant, under Burdick's supervision for part of that time.
Lloyd's affidavit stated:

> In the summer of fall of 2000, one afternoon, while sitting in my office in the human resource department at the Heflin plant, Lisa Burdick and I were discussing various topics when the subject moved to her receiving the Oxford Complex Human Resource Manager position. I told Ms. Burdick I was surprised when she received the promotion to the position over Ms. Higgins and Ms. Hithon.
>
> Ms. Burdick responded by telling me that John Pittard, her boss, told her that he

Plaintiff highlights a difference in how Pittard approached his offer to Carter and his offer to Burdick. For the former, there was allegedly no discussion about salary, relocation, or other details. In the latter, Higgins argues, Pittard discussed salary and start date. Furthermore, Higgins points out, Pittard testified that he did not think that Carter would take the job in Pine Bluff because she could not relocate but then stated that it was a plus to select Burdick, his next top candidate,

---

> would not have a black woman working for him. Pittard was the Complex Manager at the time and the decision maker in awarding Ms. Burdick the position. Both Ms. Hithon and Ms. Higgins are African-American females.

Defendant has moved to strike Lloyd's affidavit as violating Rule 26(a)'s mandatory disclosure provision. According to defendant, the affidavit was submitted by plaintiff months after discovery closed and is the first time Lloyd's name has been mentioned in the case. Tyson relies on Rule 37(c), which states: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Tyson alleges that Lloyd was not listed as a witness in either plaintiff's initial or supplemental disclosures. Here, Tyson contends, a failure to disclose is not 'harmless' when the opposing party has been surprised and denied the opportunity to depose the witness and conduct related discovery. Tyson asserts that it had no notice that Lloyd had any information regarding plaintiff's claims. Moreover, Tyson argues, plaintiff in a deposition stated that she had no knowledge of any statement made by Pittard that was racially discriminatory – then submits this affidavit.

Moreover, Tyson argues, a court may only consider evidence admissible at trial, and thus, in ruling on a summary judgment motion, inadmissible hearsay contained in affidavits is due to be stricken. *See, e.g., DeVaughn v. City of Clanton, Ala.*, 992 F. Supp. 1318, 1320 (M.D. Ala. 1997)(striking portions of affidavits containing hearsay as failing to meet requirements of personal knowledge under Rule 56(e)); *Nat'l R.R. .Passenger Corp. (Amtrak) v. H& P., Inc.*, 949 F. Supp. 1556, 1560 (M.D. Ala. 1996)(same). Although Pittard would be considered a party opponent and his statement would not be hearsay, Lloyd does not testify that she had knowledge of Pittard making any statements. Instead, Tyson asserts, Lloyd testified that Burdick told her that Pittard told Burdick the alleged discriminatory statement, which does not pass muster.

Finally, Tyson supplemented its Motion to Strike with an observation that in a case before Judge Acker involving the same promotion decision, *Hithon v. Tyson Foods, Inc.*, CV-02-AR-1835-M, on July 23, 2004, Judge Acker granted defendant's motion to strike the Lloyd affidavit, on grounds of failure to comply with Rule 56 and inadmissible hearsay.

51

because she was relocatable.

Even though Carter did not meet the minimum qualifications of the HR Complex Manager position and had only been with Tyson two years, Higgins argues, Schaeffer offered Carter the Pine Bluff job on the spot then told Carter she needed to call Pittard and decline the Oxford job for affirmative action plan purposes.[88]   Higgins argues: "Further, Carter never even knew about the Pine Bluff job; the job was not posted; no one else applied for the job and she was handpicked in order to skew the process in Oxford."[89] According to Higgins, Carter was never offered the Oxford job but was used to bypass the better-qualified person with a white candidate, Burdick.[90]  Plaintiff insists: "If Carter was such an excellent choice for the Oxford position, why was she not contacted for the open Pine Bluff job six months prior since the position had been open.  Carter was contacted only after applying for the Oxford position.  Even more telling is that during her interview at Pine Bluff, Schaeffer said he knew Carter was considering both the Pine Bluff and Oxford job.  He

---

[88] Higgins also highlight's Carter's deposition as follows:

Q:     Did you ever tell Ms. Higgins that Don Schaeffer told you that we've got someone else in mind for the job at Oxford?
A:     I may have told her that, based on what John [Pittard] told me.  Don, I don't – I don't know for sure if I would have told her that because of something Don said or because of a conversation I had with John.
Q:     But you don't deny telling Ms. Higgins that?
A:     No.
Q:     That someone told you, whether it was Don Schaeffer or John Pittard, we've got someone else in mind for the job?
A:     Yes.

[89] Plaintiff repeats facts regarding the Pine Bluff process that have been detailed earlier in this memorandum opinion.

[90] However, this court notes, it does not appear plaintiff's contention is accurate.  Pittard testified that he "informally" offered Ms. Carter the Oxford job on the telephone.

testified he was trying to sell Pine Bluff to Carter though he had never met her.  He had met Higgins and worked with her at Pine Bluff, but did not try to sell her on Pine Bluff."

Higgins highlights Carter's testimony as follows: "Q: And did anyone tell you they had another applicant in mind for the Oxford position if you took the Pine Bluff job? A: John [Pittard] told me either before or during interview, hey, I'm glad I had a chance to visit with you, you're the last person I talked to, I was about to make my decision, but now let's talk.  So that told me that there was already someone high on the list.  Who that was, I don't know.  He didn't say.  I didn't ask."

Furthermore, Higgins observes, Schaeffer testified that he thought Carter was qualified for the Pine Bluff job because of leadership qualities exhibited in a previous position that would help fight a threat of union organized campaign and lack of respect that Pine Bluff workers had for the HR department.  Schaeffer encouraged Carter to take the Pine Bluff job as it was, in his opinion, a "better fit" for her.  According to Higgins, the Oxford complex had no African-Americans in the Administrative Office, but Schaeffer estimated that there were between 25%-30% African-Americans in the Pine Bluff Administrative offices.[91]

Interestingly, Higgins asserts, Pittard assumed from a conversation with Carter that she was willing to relocate and assumed further that Higgins, who lived in Alabama, would not be willing to relocate.  However, Higgins asserts, Pittard never asked her that question.

**B.**     **Higgins Can Establish Her Prima Facie Case of Age Discrimination.**

Plaintiff cites the elements of such a prima facie case as follows: (1) she was a member of a protected group of persons between forty and seventy; (2) she was subject to adverse employment

---

[91] Plaintiff argues: "Perhaps that was the fit that Schaeffer was referring (*sic*) since Pittard also told Clark-Johnson that he picked Burdick because "she fit."

action; (3) and replaced with a person outside the protected group; and (4) was qualified to do the job. *See Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

Indisputably, Higgins asserts, at the time of the promotional decision at issue Higgins was 45 years old (thereby satisfying the first prong), Carter was 29, and Burdick was 28. Defendant has conceded that it offered the position first to Carter, then to Burdick (thereby satisfying the third prong). Further, Higgins argues, as a result of the alleged wrongful promotion decision, Higgins was denied the promotion and subsequent pay raise and increase in grade level. As of June 2001, Higgins alleges, Burdick's salary was $70,000, Carter's was $87,000, and Higgins's was $57,000. (thereby satisfying the second prong).

Plaintiff reiterates that there is no dispute that Higgins was qualified and met the qualifications for the Oxford Complex HR Manager position set forth in the job summary. Further, Higgins reiterates, Trotter had testified that Higgins was qualified and would have been his pick for the position, and Clarence Wilson had evaluated Higgins as qualified to move up to such a position.

As further evidence of race and age discrimination, Higgins argues, the Oxford complex management staff is entirely white and with the exception of two workers, under 40. According to Higgins, she has proven her prima facie case of age discrimination and she maintains her state law age discrimination count (Count 6). An ADEA and AADEA case, plaintiff asserts, can proceed simultaneously in federal court. *See Wallace v. Jim Walter Homes, Inc.*, 68 F. Supp. 2d 1303 (M.D. Ala. 1999).

**C.**    **Higgins Can Establish Pretext with Regard to the Promotion Claim.  Serious Credibility Issues Exist that Prohibit Summary Judgment.**

Importantly, plaintiff notes, John Pittard and Don Schaeffer, both white males, made all the

54

foregoing adverse employment decisions against Higgins, a black female. According to Higgins, the race of a decision maker is relevant in a discrimination action.

Higgins relies on *Wexler v. White's Furniture*, 317 F.3d 564 (6th Cir. 2003) for the proposition that Higgins can rebut Tyson's alleged unlawful reasons for the promotional decision by showing that they (1) have no basis in fact, (2) did not actually motivate the termination, and/or (3) were insufficient to warrant the challenged conduct. Furthermore, Higgins says, she may show pretext by "presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *See Evans,* supra, at 965.

According to plaintiff, the following depict defendant's serious credibility issues.

### 1.    Pittard dissuades Higgins from even applying for the position.

According to Higgins, as soon as Wilson had vacated the position, Pittard visited her in her office and asked if she was going to apply. He allegedly discouraged her, telling her that he would hate to lose her in the training department and that she could always apply for such a position in the future. In response, Higgins testified, she told Pittard she was undecided at this point but was considering the position. Higgins assets that "Pittard did everything he could" to keep her from applying for the position. In light of Higgins's qualifications and Wilson's statement that "Ever is definitely ready to be a complex HR manager," Higgins contends, there was no business reason for Pittard, the initial decisionmaker, to dissuade Higgins from this promotional decision. In this vein, Higgins argues: "A reasonable jury could conclude that while Pittard had certainly 'inherited' Wilson, the lone black in the Oxford Complex, he was certainly not going to have another. The Complex was all white. Pittard has made 17 promotional decision at the Oxford Complex. All have been white."

### 2.   Six Criteria or Nine

When Higgins initially questioned Pittard about the decision, she asserts, she was told he had ranked all candidates in six categories – "Education," "Experience," "Knowledge of the Oxford Complex," "Community Relations," and "Relationship with the Union and Leadership Skills." According to Higgins, there was no mention of "relocation," "motivation and drive," and "presence."

However, Higgins notes, in Pittard's single-page of notes from his pocket daytimer, the categories of "Knowledge of Oxford Complex" and "Leadership Skills" were missing.  In Pittard's deposition, he testified that he may have combined "motivation and drive" and "presence" to determine a ranking in "Leadership Skills."  When Cathy Clark-Johnson investigated Higgins's complaint, Pittard did not mention these additional categories and told the investigator that he picked Burdick because "she fit."

In *Reeves*, Higgins asserts, the Supreme Court made clear that proof that a defendant's explanation is unworthy of credence allows the court to reasonably infer that the defendant is "dissembling to cover up a discriminatory purpose."  530 U.S. at 134.  Furthermore, Higgins notes, *Reeves* stated: "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.*  Thus, Higgins asserts, Tyson's shifting reasons for its decision are suspect and enough to infer that the real reason was Higgins's race. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189 (11th Cir. 2004)( inconsistent reasons allowed jury to rationally question the decision maker's credibility).

### 3.   The Discriminatory Reference Check by Pittard.

Supposedly, Pittard sought and relied on reference in addition to his personal interviews with

the Complex HR Manager candidates and the resumes. According to Higgins, Pittard alleged that

he sought the opinion of Trotter, Wally Taylor, and Mark Waller with regard to Higgins, Hithon, and

Burdick. Furthermore, Clark-Johnson alleged that Pittard told her he checked references with

Johnny Whitaker, Wilson, and Trotter. However, during Clark-Johnson's investigation, Wilson and

Trotter both stated that they were contacted by Pittard after he announced Burdick was awarded the

position, at which time both Trotter and Wilson recommended Higgins. Thus, plaintiff argues,

Higgins not Burdick should have led the pack of candidates in this category.

Furthermore, Higgins notes, Pittard sought references from Burdick's and Carter's direct

supervisor but not Higgins's direct supervisor from June 1998-June 2000, i.e., Clarence Wilson, until

after the Burdick promotion was announced. Further, Higgins argues, contrary to defendant's

assertion that he consulted Trotter before the decision, Trotter denied that and said he was never

asked his opinion until after Burdick was announced. After reviewing the four candidates' resumes,

Trotter testified, Higgins was most qualified, followed by Hithon. Trotter had worked directly with

Higgins but not with Burdick. Moreover, Higgins contends, while Taylor and Waller allegedly

stated to Pittard that they would choose Burdick, Pittard does not remember them offering a reason.

According to Higgins, the only times Taylor would have worked in the same complex with Burdick

is when he was Complex Manager at Oxford in 1992 when Burdick was part-time and not reporting

directly to him, and when Burdick worked at Gadsden as a HR trainee and Shift HR Manager (at

which time they would have been physically located in separate offices). Regarding Waller, Higgins

contends, he had never directly supervised Hithon, Higgins, or Burdick.[92]

---

[92] In December 1998, when Burdick transferred from Gadsden into Waller's Complex,
Waller was allegedly leaving the company. Thus, Higgins argues, he would have known nothing
of Burdick. According to Higgins, since a Complex Manager would be aware of promotions and

### 4. RISE Program

According to Serrano (VP of HR Operations), Pittard told him that he picked Burdick in part because she implemented the RISE program and had done well with the union. The RISE program was a pilot program implemented to reduce turnover[93] and was never implemented company-wide. There were only four or five plants company-wide that were selected to use the program, and the plant manager had to approve the program. Even with the RISE program in place, Higgins alleges, Burdick's plant had the highest turnover rate of any Alabama Tyson plant, i.e., 114%, and had twice the turnover of the Gadsden plant, which was the lowest at 63.2%. Specifically, the Ashland and Heflin plants were above the Tyson average turnover rate. Higgins had not been instructed to implement the RISE program, yet Pittard used this as a subjective reason to promote Burdick. This occurred, Higgins argues, "despite [Burdick's] unsuccess (sic) at reducing the turnover rate."

### 5. Union Relations

Moreover, plaintiff argues, Burdick's union relationship was a subjective criteria with no merit, as opposed to Higgins's proven good relationship with the union. When Serrano experienced difficulties with the Pine Bluff plant, Higgins observes, she (not Burdick or Carter) was called in to assist. Serrano confirmed that Higgins had good communication and people skills and enjoyed a good relationship with the union during her 24 years of union experience, which included negotiations, arbitration, mediation, and union meetings. Additionally, Higgins asserts, she had been

---

successes within his/her Complex, Waller would have known of Higgins's successes. Therefore, Higgins concludes: "The only reason Waller could have for selecting Burdick over Higgins is to support Pittard's discriminatory actions and because Burdick is white."

[93] Tyson maintains employee turnover rates because turnovers costs the company around $2500 for each person terminated, based on the costs of rehiring, retraining, loss of services and experience. Tyson's average turnover rate is 91.5%.

a bargaining unit member, unlike either Carter or Burdick.[94]

Higgins points out that Johnny Whittaker, the Union Business Agent, had worked with Hithon, Higgins, and Burdick in a union capacity. However, Pittard never asked Whittaker which candidate had the better "relationship with the union" but instead asked the same questions of him as of other references. According to plaintiff, Whittaker would not have been in a position to assess any of the candidates' job performance. Finally, Higgins argues, defendant has not produced Whittaker's direct testimony but rather relies on Pittard's hearsay account of the conversation.

### 6.    Presence

Higgins criticizes this subjective category as "more fitting for the Miss American pageant" than the poultry industry. Pittard allegedly rated this category "based on their presence in the one-hour interview process, how they answered the questions, did they answer the questions directly, did they stay engaged in the conversation." As such, plaintiff contends, this ranking was entirely subjective. Plaintiff argues: "A reasonable jury could conclude this nonsensical category was pretext for discrimination, especially when viewing the presence of the young Burdick and the seasoned manager/trainer Higgins."

### 7.    Leadership Skills

Despite Trotter's testimony that Higgins heads up the Southeast Training center and that he would think she had impeccable leadership skills, Pittard told Higgins he ranked her the lowest in the leadership category. However, Higgins argues, leadership skills are not included in matrix provided in Exhibit A to Pittard's declaration. While knowledge of the Oxford Complex was a

---

[94] Plaintiff repeats facts regarding Schaeffer's work with Higgins at the Pine Bluff plant, which this court will not address again.

category that initially Pittard included in discussing his reasons for selection, plaintiff asserts, Pittard excluded that category in his declaration. Additionally, Higgins points out, Carter (who had attended training sessions led by Higgins) felt Higgins was a good leader. Clark-Johnson allegedly said the same thing.[95]

### 8. Community Involvement

Plaintiff finds it significant that (1) Clark-Johnson testified that she knows of no objective basis to measure the Kiwanis over the Optimist Club and (2) Trotter testified that when he interviewed for the Snead Complex HR Manager position, he was not asked about his community involvement, union relations, or leadership skills.

### 9. Sole Decision maker

While defendant contends in the summary judgment motion that Pittard was the sole decisionmaker for the promotion at issue, discovery responses named both Pittard and Schaeffer as joint decision makers for the July 2000 decision. Interestingly, plaintiff alleges, Schaeffer has admitted to being demoted without a pay decrease for a comment that "if we continue to have high turnover, ... all you'll be left with to fill your positions ...are the little monkeys coming out of high school."[96]

### 10. Burdick's Ability to Relocate

According to Pittard, while relocation was not a requirement for the Oxford Complex HR Manager position, Pittard considered it. However, Higgins asserts, previously Burdick, Trotter,

---

[95] However, this court notes, plaintiff has not cited to the record for this allegation.

[96] While he understood the comment to have a racial connotation, Schaeffer stated, he said he absolutely did not mean it in a racial way.

Pittard, and other white individuals were given promotions throughout the Alabama complex and were not required to move their residence from one city to another.[97]

Plaintiff reiterates that Carter was rated higher in the "relocation" category despite the fact that Pittard never asked Carter where she would live. However, plaintiff concedes, during Carter's interview, she told Pittard that moving from South Georgia to Oxford would create a hardship for her because of her parents, which led Pittard to assume that she did not want to relocate. Pittard never inquired about Higgins's willingness to relocate.

According to Higgins, the only Tyson employees who were required or told of a need to relocate for upward mobility were African-Americans, e.g., Wilson (former Division HR Manager over Oxford and other locations) was required soon after Pittard moved to complex to move to Arkansas to maintain his position. Instead, Wilson stepped down from the position and was reassigned by Serrano to the position of Oxford Complex HR Manager. Due to this demotion, Wilson had to directly report to Pittard. According to plaintiff, Pittard's allegation that he hired or promoted Wilson is false. Instead, Higgins asserts, defendant cannot name a single African-American that Pittard has promoted to a single middle or upper management position. While defendant contends that Pittard asked Wilson to stay on when he departed the company in 2000, Higgins argues, Pittard admitted that he might have said "it is time for you to move on."[98]

---

[97] Plaintiff goes into detail about these promotions and the respective cities. The court does not restate these allegations here.

[98] However, the court notes that the record does not reflect that Pittard ever made this statement to Wilson personally. The relevant testimony is as follows:

> Q:   Okay.  Do you recall telling Ms. Hithon that you did not try to convince Mr. Wilson to stay, that in your words, it was time for him to leave?
>
> A:   No, I don't remember that.  I don't remember that.  It could have been a reason to say it because in his mind it was time for him to leave.  But as

According to Higgins, she was held to a different standard of promotion than the others because she did not live in Oxford, yet that criteria was never used with white managers regarding promotions.

### 11.     Second Selection Process: Recommendation or Cover-up

While defendant contends that during the second selection process the decision to promote Burdick was unanimous among the four panelists, Higgins contends, the only African-American panelist, Parks, stated that he understood that each panelist was to make an individual recommendation, with the actual decision to be made by some unknown person at a later date. Parks recommended Higgins, not Burdick.

### 12.     Underutilization of Minorities

Trotter confirmed Tyson's policy to correct the underutilization of minorities when possible. According to him, if two candidates are equal, and one is a minority, then the minority would get the job because that is the law. According to Higgins, it is not reasonable for an employer to disregard its own employment policies. *See Hill v. Seaboard Coast Line R.R.,* 885 F.2d 804, 811 (11th Cir. 1989)(affirming district court's finding of pretext where employer's reason was inconsistent with employment process in general and previous employment decisions).

Plaintiff contends that Tyson was "grossly underutilizing minorities in management." *See*

---

    far as my opinion, the time for him to leave, I had no reason to want Clarence to leave.

Q:    I'm confused.  Is it you could have said that now to Ms. Hithon?

A:    It could have been said in a context if it was a better decision for Clarence personally to leave, then it was time for him to leave.  So it's possible it would have been said in that context.  But from a personal need standpoint on my feelings as him as an HR manager, there would be no reason to say that it was time for him to leave . . .

(Pittard Depo. p. 380-81)

*infra* disparate impact argument.

**D.      Evidence of Racial Animus - Pittard's Statements Prohibit Summary Judgment**

Here, defendant relies upon Melody Lloyd's affidavit. *See infra.* n. 87.  In opposition to the

motion to strike, plaintiff contends that Lloyd's affidavit does not constitute inadmissible hearsay

due to the exception for admissions of a party opponent. *See* F.R.C.P. Evid. 801(d)(2)(D).[99]

Plaintiff repeats her evidence regarding Pittard's alleged failure to promote black employees,

which she says evidences a pattern or practice of racial discrimination.  Under Title VII, Higgins

argues, a pattern or practice of discrimination must be proved by more than the mere occurrence of

isolated discriminatory acts but rather that racial discrimination was the employer's regular practice.

*See Shuford v. AL State Bd. of Educ.*, 846 F. Supp. 1511, 1521 (M.D. Ala. 1994)(citation omitted).

**E.      Defendant's Subjective Criteria for the Position Are Not Legitimate.**

After noting that a subjective reason is legally sufficient if the defendant articulates a clear

and reasonably specific factual basis for it, *see Denney v. City of Albany*, 247 F.3d 1172, 1186 (11th

Cir. 2001),[100] Higgins points out that courts apply a higher scrutiny to subjective reasons. *See Carter*

---

[99] The court has considered fully but will not recite plaintiff's citations here.

[100] *Denny*, this court notes, also found:

As we recently explained in *Chapman*:

> A subjective reason can constitute a legally sufficient, legitimate,
> nondiscriminatory reason under the *McDonnell Douglas/Burdine* analysis. Indeed,
> subjective evaluations of a job candidate are often critical to the decisionmaking
> process, and if anything, are becoming more so in our increasingly
> service-oriented economy.... Personal qualities ... factor heavily into employment
> decisions concerning supervisory or professional positions. Traits such as
> "common sense, good judgment, originality, ambition, loyalty, and tact" often
> must be assessed primarily in a subjective fashion, *Watson v. Fort Worth Bank &*
> *Trust*, 487 U.S. 977, 991, 108 S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988), yet they

63

*v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998).[101]   Additionally,

Higgins argues, subjective reasons by their nature often serve to mask discrimination.  *See Roberts*

*v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 798 (11th Cir. 1988)("[I]nformal, secretive and subjective

hiring or promotion decision processes tend to facilitate the consideration of impermissible

criteria."); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir. 1985)("This circuit has frequently

noted ... that subjective evaluations involving white supervisors provide a ready mechanism for racial

---

> are essential to an individual's success in a supervisory or professional position.
> *See id.* at 999, 108 S.Ct. at 2791 ("It would be a most radical interpretation of
> Title VII for a court to enjoin use of an historically settled process and plainly
> relevant criteria largely because they lead to decisions which are difficult for a
> court to review.").  It is inconceivable that Congress intended anti-discrimination
> statutes to deprive an employer of the ability to rely on important criteria in its
> employment decisions merely because those criteria are only capable of subjective
> evaluation.  *See Watson*, 487 U.S. at 999, 108 S.Ct. at 2791. To phrase it
> differently, subjective reasons are not the red-headed stepchildren of proffered
> nondiscriminatory explanations for employment decisions. Subjective reasons can
> be just as valid as objective reasons.... A subjective reason is a legally sufficient,
> legitimate, nondiscriminatory reason if the defendant articulates a clear and
> reasonably specific factual basis upon which it based its subjective opinion.

229 F.3d at 1033-34 (citations omitted).

[101] *But see Wilson v. B/E Aerospace, Inc.*, 2004 WL 1459558 (11th Cir. 2004):

> Wilson's argument that she has a lighter burden of proof because B/E used
> subjective criteria in the decisionmaking process is erroneous. This Court
> has refused to adopt a lower standard when employers use subjective
> criteria. *See Chapman*, 229 F.3d at 1033-35 (en banc). Chapman
> "confirmed beyond doubt the appropriateness of an employer using
> legitimate, non-discriminatory subjective factors in its decision-making."
> *Denney*, 247 F.3d at 1186 n. 7. We have explained that "an employer's use
> of subjective factors in making a hiring or promotion decision does not
> raise a red flag. Certainly nothing in our precedent established that an
> employer's reliance upon legitimate, job-related subjective considerations
> suggests in its own right an intent to facilitate discrimination." Id. at 1186.

discrimination. This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another."). *See also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998)(en banc)("Particularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination.")

## F.   HIGGINS'S DISPARATE IMPACT CLAIM CAN SURVIVE SUMMARY JUDGMENT

### 1.   Higgins's Charge of Discrimination Preserved Her Claim of Disparate Impact.

The question here, Higgins contends, is whether Higgins's complaint was like or related to, or grew out of, the allegations in her EEOC charge. *See Sanchez* at 466. According to plaintiff, the charge contained language that other "similarly situated individuals had been discriminated against." on the basis of race and age. Plaintiff contends that her disparate impact count mirrors her EEOC charge.

### 2.   Higgins's Claim of Disparate Impact Is Not Barred by the Two-Year Statute of Limitations.

Plaintiff alleges that her claim is timely based upon the following: the final decision to place Burdick in the position was made in December 2000, the EEOC issued a cause finding dated July 2, 2002, and plaintiff filed this action on July 25, 2002.

### 3.   Higgins Can Satisfy the *Prima Facie* Elements of Her Disparate Impact Claim.

To prove a disparate impact claim, Higgins asserts, she must demonstrate: (1) a significant statistical disparity between the proportion of minorities in the available labor pool and the proportion of minorities hired; (2) a specific, facially-neutral employment practice which is the

alleged cause of the disparity; and (3) a causal nexus between the specific employment practice and the statistical disparity.[102]

### a.    Element One

Regarding element one, plaintiff provides the following information regarding the four locations – Heflin, Ashland, Feed Mill and Hatchery – that comprise the Oxford Complex.

As for Heflin, she alleges, in the year 2000 this location represented 307 total employees , or 24% of the total employees in the Oxford Complex. Of these employees, 182 (61%) are African-Americans. Job Group 1B, i.e., middle management, consists of 13 employees who are all white. According to Tyson's Affirmative Action Availability Analysis for 2000, 80% of promotions to Job Group 1B are made internally. Tyson represents that placements made in the this job group are normally made from promotions within the location. Job Group 1C, i.e., entry-level management, serves as the "feeder group" for those internal promotions. The minority availability for Job Group 1B is 41.67%. Thus, Higgins argues: "A significant statistical disparity exists between the percentage of minorities available for promotion (41.67%) and the percentage of minority utilization in Group 1B (0%), indicating zero percent utilization of minorities in the middle management job group 1B. The location identified middle management as an area of underutilization in the Facility Goals and Timetables for ... 2000. Tyson's Annual Goals Report reflects that the percentage of minority underutilization at this location is 35.64%."

Regarding Ashland, plaintiff asserts, in 2000, this location represented 855 total employees,

---

[102]    *See generally, MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 771 (11th Cir. 1991)(citations omitted).

While plaintiff cites *EEOC v. Joe's Stone Crabs*, 296 F.3d 1265 (11th Cir. 2002) for this proposition, the court cannot find it contained within that case.

or 65% of the total number of employees in the Oxford Complex. Of these employees, 705 (85%) were African-Americans. Of these employees Job Group 1B consists of a total of 15 employees, of whom 11 are white. Minority utilization in this job group is 26.67%. Plaintiff repeats information about the internal hiring process to fill this job group, including that Job Group 1C, i.e., entry-level management, provides the "feeder group." According to Higgins, the minority availability for Job Group 1B is 63.33%, leaving a statistically significant disparity between the percentage of minorities available for promotion (63.33%) and the percentage of minorities utilized in 1B (26.67%). Thus, Higgins argues, minorities are underutilized by 36.66% in the middle management group at this location.

Turning to Talladega, Higgins asserts, there are 37 employees at this location of whom 86.47% are white. Tyson has no Affirmative Action Plan for this location since it has fewer than 50 employees, and the same may be said for the Anniston Hatchery location, where there are 33 employees of whom 69.7% are white.

### b.    Element Two

According to Higgins, Clark-Johnson's testimony excludes the Oxford Complex Office (headquarters) as part of the makeup of the Oxford Complex. Many of Tyson's Complex Offices are set up at off-site locations. By plaintiff's account, Tyson has a practice of housing its middle and upper level complex management positions at the off-site locations, resulting in a location with less than 50 people. For Affirmative Action reporting purposes, Higgins contends, Tyson treats the off-site complex office locations as independent locations, thereby eliminating the requirement to compile an annual AAP. The August 7, 2000 population report indicates that the Oxford Office housed 37 people, of whom 94.59% were white. In 2000, Higgins asserts, Albertville and Snead –

the two other Alabama Complex Offices, reflect similar statistics of less than fifty people in each and all of the management there being white.  Thus, Higgins concludes: "It is evidence from the statistics that Tyson's EEO and Affirmative Action policies, promising non-discrimination, are not applied in Alabama at the Complex management levels."

### c.   Element Three

Because the Oxford Complex office housed less than 50 people, Higgins asserts, Tyson is not required to compile an AAP from the 2000 AAP data for the Complex office or to set goals to remedy minority underutilization at the Complex level.  According to plaintiff, qualified minorities for complex level management positions in Alabama do not get the benefit of Affirmative Action due to Tyson's practice of housing these positions at locations of less than 50 people.  In this vein, Higgins argues: "As in the case of the Oxford Complex HR position in dispute, the defendant's hiring agents at the Complex office locations are permitted to by-pass Company practice, manipulate the selection process and use discriminatory selection criteria to exclude hiring and promoting qualified minority candidates to the Complex level positions."

Again, plaintiff emphasizes, Serrano testified that it is company practice to review personnel files before making a promotional decision.  Since Pittard's stint as Complex Manager of the Oxford Complex, Pittard has promoted 17 people to middle and upper management, all of whom are white.  According to Higgins, the statistics for the Alabama Complexes show that white employees hold more than 98% of the available middle and upper level management positions housed at the Complex offices.  In conclusion, plaintiff contends:

The Company's practice of setting up locations of less than 50 people to

house middle and upper level Complex positions and treating them as separate entities has, in effect, created a "glass ceiling" for minorities for the Complex management level positions. The Company's EEO and Affirmative Action policies promising non-discrimination fail at the Complex level, resulting in an adverse impact. Further, statistics for the middle management positions at the processing plants that make up the Oxford Complex reveal that minorities are available internally to fill more than 50% of the positions in Job Group 1B – middle management. However, white employees hold more than 85% of these positions, resulting in more than a 35% underutilization of minorities.

## III.   Defendant's Reply[103]

### A.   Plaintiff's Claims of Disparate Treatment Race and Age Discrimination Fail as a Matter of Law.

#### 1.   Plaintiff fails to establish her prima facie case.

Defendant reiterates its argument that Higgins cannot meet her burden of establishing that an equally or less qualified employee was promoted. According to Tyson, plaintiff's argument that Burdick was less qualified for the Oxford position is based solely on the plaintiff's greater seniority at Tyson. In fact, Tyson asserts, seniority was only one of many factors considered in the promotion decision.

Defendant lists the following evidence:

- Pittard spoke with Tyson managers[104] who had worked with Higgins, Hithon, and Burdick and asked each one what candidate he would select for the position.
- Taylor informed Pittard that he would promote Burdick out of the three candidates.

---

[103] According to Tyson, "there are so many inaccuracies and misstatements in Plaintiff's brief, Defendant cannot possibly identify each and every one. As such, Defendant has provided the Court with evidence of what it considers to be Plaintiff's most blatant misrepresentations."

[104] These managers were Taylor, Complex Manager at the Snead facility; Trotter, Training Manager; Waller, former Oxford Complex Manager; and Whittaker, Union Business Agent. Pittard did not ask these individuals about Carter because they hadn't worked with her. To ascertain Carter's qualifications, Pittard spoke with David Massey, Complex Manager for Southern Georgia, and Jonathan Andrews, Complex Manager at the Buena Vista facility.

- By Pittard's own account, Trotter initially told him he would choose Higgins in order to avoid an EEOC or other lawsuit but when re-asked just to disregard that consideration and pick the best person for the job, Trotter chose Burdick.
- Trotter's deposition stated that he would have chosen Higgins "reason being this whole thing that's going on right now to be avoided" while never saying that he thought Higgins was more qualified than Burdick.
- Waller, who defendant asserts <u>did</u> supervise Burdick when he was Complex Manager of the Oxford facility, informed Pittard that he would promote Burdick.
- Whittaker told Pittard he would choose Burdick based on Burdick's working relationship with the current union stewards and employees at the Oxford facility;[105]
- Carter testified that Higgins had more seniority and experience in HR (which were two factors considered by Pittard but not the only ones).
- Clark-Johnson testified that she had "no opinion" because she was not the hiring manager and did not "know of any HR person that would look at a resume and say who is most qualified."
- Schaeffer testified that Burdick was the most qualified.
- Trotter testified that Higgins was most qualified "looking only at the resumes."
- Pittard spoke with Jesse Parker, Burdick's direct supervisor, who rated Burdick highly.
- Pittard did not seek a reference from Higgins's direct supervisor since Pittard had worked with her for years and had a good understanding of her work history and performance.
- Pittard did not ask Parker to choose from the candidates because he was not aware that Parker had ever worked with the others.
- Pittard then generated a matrix to assess the candidates (see Exhibit A to Pittard's Declaration).[106]
- Although plaintiff ranked the highest in HR management at Tyson and in total HR experience, these were only two of the factors considered by Pittard in determining the most qualified candidate.
- Plaintiff was less qualified based on references, as all managers contacted rated Burdick above plaintiff as their choice for the position.
- Plaintiff was less qualified in union relations as reported to Pittard by Whittaker,

---

[105] While plaintiff claims that Pittard never asked Whittaker which candidate had a better relationship with the union, defendant contends that this allegation is unsupported and that it was Pittard's reason for calling Whittaker.

[106] According to Tyson, plaintiff's emphasis on six rather than nine categories is misplaced. First, Tyson argues, the email authored by Hithon which outlines Hithon's understanding of Pittard's rankings as they were allegedly explained to her by Schaeffer is inadmissible hearsay. Second, Tyson contends, Pittard's day timer notes from July 2000 clearly establish that he used nine categories at the time of the decision.

Union Business Agent.[107]   Whittaker specifically addressed the candidates' relationship with the union leadership at the Oxford plant, and determined that Burdick had the strongest relationship with these individuals.

- Plaintiff was less qualified when her total ranking is compared to that of the other candidates.

- Based on all of the information he had collected at the time of his decision, Pittard determined that Carter, an African-American, was the most qualified for the position in Oxford.[108] Pittard based his decision on the facts that: Carter had a college degree; was bilingual; had great successes in her current plant; had high references; was willing to relocate; exhibited a high degree of enthusiasm and motivation for the job; and interviewed extremely well.  During her interview Carter gave specific answers to Pittard's questions and gave descriptions of programs that she initiated in her then current role as Plant HR Manager.  Pittard also felt that Carter was innovative because she developed solutions to though problems.

- When Carter turned down the position, Pittard determined that the next qualified candidate was Burdick.  Pittard testified that he selected Burdick because she: was successful in her job; had a good track record; had a high degree of enthusiasm about the job; had a college degree; was heavily involved in the community and willing to do more; and was given high marks by all her references.

- An independent review panel at Tyson revisited the promotion decision and also determined that Burdick was more qualified than plaintiff for the position.  Higgins, Hithon and Burdick all interviewed with the panel, and were asked questions designed by the consulting firm to elicit the candidates' assessments of their own competence in the areas of intellectual, personal, interpersonal, management, leadership, and motivational.  Each interview lasted approximately three and a half hours and each candidate was asked the same questions.  Each panelist was also given a copy of the candidates' resumes to review before their interviews.

- Before the interviews began, the panel was informed that it was to make the best selection for the position and that whomever the panel selected would be placed in the position.  The panel was told that their job was to "second-interview these individuals as if this position had never been filled." At the end of each candidates's interview, the panel reviewed their opinions of the candidate's strengths and weaknesses.  After the interviews, each panelist ranked the candidates in the following manner:

---

[107] Defendant argues that plaintiff's counter argument that she had 24 years of experience with the union is simply a restatement of plaintiff's argument that her seniority should dictate the decision, as she had only been with Tyson for 24 years.

[108] Defendant argues that plaintiff fails to establish by evidence that the initial offer of the position to Carter was based on a conspiracy to cover-up Pittard's supposed discriminatory animus.

| Mantooth | Roles | Eggman | Parks |
|----------|-------|--------|-------|
| 1. Burdick | 1. Burdick | 1. Burdick | 1. Higgins |
| 2. Higgins | 2. Higgins | 2. Higgins | 2. Burdick |
| 3. Hithon | 3. Hithon | 3. Hithon | 3. Hithon |

- Three of the four panelist determined that Burdick was the most qualified candidate for the position. The fourth panelist, Parks, determined that Higgins and Burdick were equally qualified, but that Higgins should receive the promotion because of her seniority. The panel ultimately recommended that Burdick was "the candidate who best fits the Oxford Complex HRM position."[109]
- Burdick has been employed by Tyson in a personnel function since June 1992.

Defendant also argues that plaintiff misrepresents various elements of Burdick's work history to establish that she was more qualified than Burdick. Although plaintiff points out that the turnover rate at Burdick's plant when she was human resources manger was 114%, defendant points to the fact that Burdick had reduced the turnover rate from approximately 250% to 114%.

## 2.    Plaintiff's failure to promote claim fails as a matter of law.

Defendant argues that even if this Court finds that plaintiff has established a *prima facie* case of race and age discrimination, her claims fail as she has not presented significant evidence establishing that defendant's legitimate and nondiscriminatory reason for not selecting plaintiff for

---

[109] Defendant argues that plaintiff makes allegations about the process of the independent review panel that are unsupported by the record evidence. Defendant states that contrary to plaintiff's claims that Roles testified the position required 3-5 years of HR experience at Tyson, Roles actually testified that it required 3-5 years of "HR or related experience." Defendant also argues that plaintiff's claims that Burdick told the panel that she utilized her experience in the Oxford position in responding to questions, is not supported by the deposition testimony. Additionally defendant questions the basis for plaintiff's claims that she was "disqualified" based on her inability to relocate. Defendant states that the panel concluded that mobility was important, but did not "disqualify" anyone based on ability to relocate. Finally, defendant disputes plaintiff's arguments that the panel interviews were somehow suspect because Carter, who was originally chosen for the position, did not re-interview. Defendant argues there was no reason for Carter to participate in the review panel process as she was no longer a candidate for the position, having accepted the Pine Bluff offer.

the promotion was a pretext for race and age discrimination.[110]

Defendant argues that plaintiff cannot establish that no reasonable individual could have chosen Burdick for the position.[111] Defendant points out that Taylor, Trotter, Waller, Whittaker and Pittard all chose Burdick and that three members of the independent review panel (Mantooth, Roles, and Eggman) chose Burdick.

---

[110] Defendant reiterates the legal standards discussed in its original motion for summary judgment. *See supra.* In a failure to promote case, "a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the officer who received the position he coveted." *Alexander v. Fulton Co.*, 207 F.3d 1303, 1339 (11th Cir. 2000). "Rather, [plaintiff] must adduce evidence that the disparity in qualifications is 'so apparent as virtually to jump off the page and slap you in the face.'" *Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001) (quoting *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir. 2001)). For discrepancies to "jump off the page and slap you in the face," they must be of such weight and significance that no reasonable person, in the exercise of impartial judgement, could have chosen the selected candidate over plaintiff. *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000). The defendant notes that the Eleventh Circuit has stated that a court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second-guesses employers' business judgments" *Id.* (quoting *Simms v. Oklahoma ex rel. Department of Mental Health and Substance Abuse Services*, 165 F.3d 1321 (10th Cir. 1999)), cert. denied, 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999); *see also Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision"). A court does "not ask whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive." *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001).

[111] Plaintiff also argues that both Carter and Burdick were chosen over plaintiff because of her age. Defendant argues that plaintiff fails to offer any significant evidence of age discrimination. According to defendant, the simple facts that plaintiff was 45 years old, Carter was 29 years old and Burdick was 28 years old at the time of the decision is not alone evidence of age discrimination. Defendant points to *Goldstein v. Manhattan Industries, Inc.*, where the Eleventh Circuit held, "The mere fact that one employee is replaced with another who is younger certainly does not, without more, give rise to an inference that age was even considered in the decision." 758 F.2d 1435, 1443 (11th Cir. 1985). Defendant asserts that plaintiff's only other allegation regarding age discrimination is her assertion that she was paid less. Defendant argues that plaintiff has failed to properly assert any disparate pay claim and that it is not clear how any alleged pay disparity is evidence of age discrimination regarding the promotion decision.

73

### a.   Plaintiff's claim that the offer to Carter was a sham.

Defendant argues that contrary to plaintiff's assertions that Carter testified she was "used" so that Pittard could hire Burdick, Carter testified that when she spoke with plaintiff, plaintiff gave her "the impression that it was something other than legitimate at the time." However, Carter did not reach the conclusion that she had been used by Pittard.[112]

Defendant also objects to plaintiff's arguments that Carter did not meet the minimum requirements of the job—specifically, the requirement of at least 3 years experience in Tyson management. Contrary to plaintiff's assertions that the position required 3 to 5 years of Tyson management experience (cite to Schaeffer's deposition), defendant points to Schaeffer's testimony that the position required "general management experience," not necessarily in the poultry industry. (Schaeffer Depo. p. 32). Defendant contends that Carter met this requirement, as she has worked in a management position since March 1997. Defendant also disputes plaintiff's claims that Carter was never offered the Oxford position by pointing to the following testimony taken from Carter's

---

[112] Defendant points to the following excerpts from Carter's deposition:

| | |
|---|---|
| Q: | As you sit here today with a few more facts about the process do you feel that the process was manipulated and you used so a white female could be placed in the position? |
| A: | No.  (Carter Depo. pp. 49-50). |

----------------

| | |
|---|---|
| Q: | As you sit here today and I bring it to your attention, does it make bells, sirens and whistles go off in you head? |
| A: | No. |
| Q: | Does it cause you concern? |
| A: | No. |
| Q: | Do you see that the position was manipulated? |

. . . .

| | |
|---|---|
| Q: | . . . Do you see that the position at Oxford and the selection process was manipulated, as you sit her today. |
| A: | No.  (Carter Depo. pp. 74-75). |

deposition:

> Q:    Did Mr. Pittard ever offer you the Oxford job?
> A:    Yes.
> Q:    When?
> A:    Within a week, week and a half after my interview with him.
> Q:    And what did he say when he offered you the job?
> A:    Something to the effect of you've been selected as my candidate for the position.  I know you're – somehow he gained knowledge of the Pine Bluff opportunity.  I know you're considering that, but just know that this – I'm offering this job to you.

(Carter Depo. pp. 38-39).

Defendant also takes issue with plaintiff's assertion that the Pine Bluff position was never posted, stating that the deposition testimony cited by plaintiff in support of this assertion establishes only that Carter did not learn about the opening until after her interview with Pittard.[113]  Further, Schaeffer testified that he "was sure" it was posted.  (Schaeffer Depo. p. 19).  Defendant further disputes plaintiff's claim that Carter was the only individual interviewed for the Pine Bluff position and was offered the job on the spot.  Defendant points to Schaeffer's testimony that Carter was not the only individual interviewed (Schaeffer Depo. p. 19).[114]  In contrast to plaintiff's allegations that

---

[113] The relevant testimony is as follows:

> Q:    You interview for that job with Mr. Pittard, and then you heard from Mr. Schaeffer about the Pine Bluff job in the interim, or did you hear from Mr. Schaeffer before your interview with Mr. Pittard?
> A:    the former, I found out about the – I was contacted about Pine Bluff after my interview with Mr. Pittard.
> Q:    Okay.  And prior to this, you had never heard or seen anything about an opening in Pine Bluff in human resources?
> A:    That's correct.  (Carter Depo. p. 42).

[114] However, the court notes that Schaeffer testified that he did not recall who the other candidates were for the Pine Bluff position and that he did not recall interviewing anyone else for the position.  (Schaeffer Depo. p. 23).  Additionally, the court notes that defendant also points to Carter's testimony that she was offered the Pine Bluff job "within the week of talking with Don Schaeffer" (Carter Depo. p. 41) to rebut plaintiff's claims that Carter was offered the Pine Bluff position on the spot.  However, Carter's testimony concerning this point does not make the time

75

she was never told that Carter had been offered the job in Oxford and turned it down, defendant

points to a communication sent by plaintiff, in which she stated that Pittard told her that the job was

first offered to Carter (Pl. Depo. p. 42–HH073).

Defendant further disputes plaintiff's allegation, in support of her claim of pretext,  that

Pittard stated it was "time for Wilson to go." Defendant points to Pittard's deposition testimony that

when Wilson (the previous Oxford Complex HR manager and an African American male) gave his

notice, Pittard tried to talk him out of the decision.  (Pittard Depo. p. 53).  Pittard testified that he

tried to change Wilson's mind because they "had worked together a long time.  He had worked for

me as a plant HR manager in Gadsden and been with the company a long time, and I just wanted to

be sure it was in his best interest."  (Pittard Depo. p. 52).  Defendant states that plaintiff has failed

to offer any evidence that Pittard ever said it was "time for Wilson to go."  When asked if he had

ever made such a statement, Pittard testified that he did not recall making any such statement but if

he did, "it could have been said in a context if it was a better decision for [Wilson] personally to

leave, then it was time for him to leave.  So it's possible it could have been said in that context.  But

from a personal need standpoint on my feelings as him as an HR manager, there would be no reason

_____

of the Pine Bluff offer clear.  The testimony is as follows:

    Q:   Okay.  And then what happened in the sequence of things between the Oxford and
         the Pine Bluff job?
    A:   After my interview in Oxford about, like I said, within the week I heard about the
         opportunity in Pine Bluff; and I received a phone call from Don Schaeffer asking
         if I would be interested in exploring the opportunity, basically coming down to the
         facility and visiting with him one on one.  And I agreed to do that, and I did that
         within a week or so of that conversation.  Somewhere along the line in there, John
         Pittard had called me about the offer for Oxford, acknowledged that, I said I'd
         take it into consideration as I go to Pine Bluff.  Went to Pine Bluff, and then
         within the next week gave my decision about my selection, which was Pine Bluff.
         (Carter Depo. pp. 40-41).

to say that it was time for him to leave. [Wilson] had some other things going on outside of work involving the ministry, and it was my opinion that this would have given him some more time to spend there." (Pittard Depo. pp. 378-81).[115]

Defendant also replies to plaintiff's reliance on Carter's testimony to establish the fact that Clark-Johnson made "extensive" notes in her investigation of the promotion decision and that those notes have not been produced. Defendant points to the following portion of Carter's testimony:

> Q: Did you see [Clark-Johnson] writing?
> A: No. It was via telephone.
> Q: Okay. Did she ever provide you anything that she wanted you to sign?
> A: No.
> . . . .
> Q: Did you ever sign anything?
> A: No.
> Q: The one time that was in person, did you see Ms. Clark-Johnson taking notes?
> A: No.

(Carter Depo. pp. 61-63).

Defendant states that plaintiff's only other evidence of pretext is her claims that Melody Lloyd, an individual terminated by Tyson who has absolutely no connection to this matter, told plaintiff that she heard from Burdick that Burdick heard from Pittard that Pittard would not hire a black female.[116] Defendant argues that this evidence is inadmissible double hearsay, and that the

---

[115] Defendant contest plaintiff's assertion that Pittard did not hire Wilson. Defendant points to Pittard's testimony that Wilson was working in divisional HR and wanted to step down to the Complex HR position in order to avoid relocation to Arkansas. (Pittard Depo. pp. 46-47). Pittard was asked if he would approve Wilson to fill the Oxford Complex HR position and Pittard approved the transfer. (Pittard Depo. p. 47).

[116] In support of its argument that this evidence is unbelievable, defendant points to plaintiff's testimony that she had no knowledge of any statement made by Pittard that was racially discriminatory (Higgins Depo. pp. 450-451).

copy of the affidavit served on Tyson is not signed by a notary and is therefore deficient.[117] Additionally, defendant argues that Lloyd's affidavit should be excluded under Federal Rule of Civil Procedure 37(c)(1). Defendant claims that Lloyd was never identified as a witness by plaintiff in this suit, that Lloyd's name has never come up during discovery, and that Lloyd has no connection to this litigation.

**B.    Plaintiff's Claim of Disparate Impact Race Discrimination Fails as a Matter of Law.**

**1.    Plaintiff's failure to allege disparate impact in her EEOC charge bars this claim.**

Defendant reiterates its argument that plaintiff failed to allege disparate impact in her EEOC charge and thus did not exhaust her administrative remedies as required under the law.  "Absent some allegation of fact sufficient to put the defendant on notice of the nature and scope of the claim against it, the plaintiff is barred from asserting other types of claims in subsequent judicial proceedings that may bear some connection, however distinct, to the bare claim asserted in the EEOC charge." *Murray v. John D. Archbold Mem. Hosp. Inc.,* 50 F.Supp.2d 1368, 1380 (M.D.GA. 1999).  Defendant again argues that in this matter, plaintiff did not assert any allegations of disparate impact in her EEOC charge, but simply stated only that "other similarly-situated [*sic*] have been discriminated against."  Defendant states that these words do not sufficiently allege a disparate impact claim.  Defendant points to the fact that the EEOC's determination letter of July 2, 2002 does not mention anything about an allegation of disparate impact, indicating that the Commission must not have considered plaintiff's charge sufficient notice of such a claim.  Defendant further claims

---

[117] Defendant has filed a motion to strike Lloyd's affidavit. *See supra* note 87.

that there is no evidence that plaintiff raised such a claim during the course of the Commission's

investigation.  Given this lack of notice, defendant asserts that plaintiff failed to satisfy all of the

conditions precedent to filing a Title VII suit and therefore her disparate impact claim should be

dismissed by summary judgment.[118]

<b>2.      Plaintiff fails as a matter of law to establish a disparate impact claim.</b>

Defendant addresses plaintiff's argument that there is significant statistical disparity between

the proportion of minorities in the available labor pool and the proportion of minorities hired by

Tyson.  Defendant argues plaintiff offers no statistical analysis to support this position but relies on

anecdotal evidence.  Defendant asserts that courts have repeatedly rejected attempts by plaintiffs to

establish discrimination claims based on statistics having no analytical foundation.[119] *See Wilson*

*v. B/E Aerospace, Inc.,* 2004 WL 1459558 at *7 (11th Cir. (Fla.) June 30, 2004) ("Statistics without

any analytical foundation are virtually meaningless." (quoting *Evans v. McClain of Ga., Inc.,* 131

F.3d 957, 963 (11th Cir.1997)); *Evans v. McClain, Inc.,* 131 F.3d 957, 963 (11th Cir. 1997)

(rejecting plaintiff's anecdotal evidence that, despite employing 650 employees in eight plants,

employer had only three black supervisory employees).

Defendant further claims that the statistics offered by plaintiff in support of her disparate

impact claim have been rejected by the United States Supreme Court as an improper comparison for

---

[118] *See Murray*, 50 F.Supp.2d at 1381-82 (holding that plaintiff's EEOC charge of race
discrimination with respect to herself did not include plaintiff's disparate impact claim, resulting
in the dismissal of her EEOC administrative remedies—"the undisputed facts in the record show
that the EEOC investigated her charge of race discrimination only with respect to her application
for employment, rather than with respect to the potentially disparate impact the weight policy
may have upon black applicants").

[119] Defendant points out that plaintiff's "statistics" offer no analysis as to other possible
variables affecting the "statistics."

79

discrimination cases. In *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642 (1989), the plaintiff

argued that because there was a racial imbalance in the work force, he had established a disparate

impact claim.[120]   In support of this argument, plaintiff offered statistical evidence that a high

percentage of nonwhite workers was employed by the defendant in noncannery (management)

positions. *Id.* at 650. Defendant argues that the  very same argument is made by plaintiff in this

case. In *Wards Cove,* the Court entirely rejected this analysis, finding it flawed for several reasons.

*Id.* at 651.

> Most obviously, with respect to the skilled noncannery jobs at issue
> here, the cannery work force in no way reflected "the pool of qualified job
> applicants" or the "qualified population in the labor force." Measuring alleged
> discrimination in the selection of accountants, managers, boat captains,
> electricians, doctors, and engineers--and the long list of other "skilled"
> noncannery positions found to exist by the District Court, . . . by comparing
> the number of nonwhites occupying these jobs to the number of nonwhites
> filling cannery worker positions is nonsensical.
> . . . .
> Racial imbalance in one segment of an employer's work force does
> not, without more, establish a prima facie case of disparate impact with
> respect to the selection of workers for the employer's other positions, even
> where workers for the different positions may have somewhat fungible skills.

*Id.* at 651-53.

The Court further held that an analysis which isolates the employer's current employees as

the potential "labor force" is "at once both too broad and too narrow in its focus." *Id.* at 653.

> It is too broad because the vast majority of these cannery workers did
> not seek jobs in unskilled noncannery positions; there is no showing that
> many of them would have done so even if none of the arguably "deterring"

---

[120] In Section 105(a) of the 1991 Civil Rights Act, Congress overruled *Wards Cove's*
holding that the employer has only the burden of production, not persuasion, as to its business
necessity in a disparate impact case.  The 1991 Act, however, leaves unchanged the standards for
a *prima facie* case discussed above. *See Cota v. Tucson Police Dept.,* 783 F. Supp. 458, 472 (D.
Ariz. 1992).

> practices existed. Thus, the pool of cannery workers cannot be used as a surrogate for the class of qualified job applicants because it contains many persons who have not (and would not) be noncannery job applicants. Conversely, if respondents propose to use the cannery workers for comparison purposes because they represent the "qualified labor population" generally, the group is too narrow because there are obviously many qualified persons in the labor market for noncannery jobs who are not cannery workers.

*Id.* at 653-54. Defendant argues that plaintiff's analysis similarly isolates the employer's current employees as the potential "labor force." Given *Wards Cove*, defendant argues that plaintiff's anecdotal analysis comparing the percentage of minorities "available for promotion" and the percentage of minorities in "middle management" is statistically unsound and has been rejected by the United States Supreme Court.

Additionally, defendant alleges that plaintiff has failed to identify any Tyson policy or practice that accounts for the alleged "statistical disparities." Although plaintiff argues that Tyson has a practice of housing its middle and upper level managers at off-site locations resulting in eliminating any requirement for Affirmative Action Plan reporting at these sites, defendant asserts that plaintiff fails to establish by any evidence that Tyson has any such practice.

Finally, defendant alleges that plaintiff offers no statistical analysis to establish that this alleged "practice" has caused the exclusion of applicants for promotions because of their membership in a protected group. Defendant asserts that it is unclear how not considering certain locations as being subject to an Affirmative Action Plan excludes certain applicants for promotions because of their race. If anything, defendant argues, such a practice simply would not afford the minority preferential treatment.

## CONCLUSIONS OF COURT

The following claims have now been conceded by the plaintiff: (1) Intentional infliction

of emotional distress; (2) Negligent hiring; (3) Conversion; (4) Willful misrepresentation; (5)

Fraud in the inducement; (6) Breach of contract; and (7) Breach of implied covenant of good

faith and fair dealing.  The broad remaining claims, as advised by the plaintiff, to be considered

are: (1) Race discrimination under Title VII and § 1981; (2) Title VII disparate treatment and

Title VII disparate impact; and (3) State law and federal law age discrimination.  The only claims

still maintained by the plaintiff are race and age discrimination claims related to the Oxford

Complex HR Manager position, plus disparate impact claims.

    This court starts with the determination that there is not sufficient evidence to support a

disparate impact claim.  There is no evidence of any purported neutral policy which had a

disparate impact on female employees, African American employees or employees over forty

years of age.  In *Lee v. GTE Florida, Inc.*, the court said:

> First, Lee's claim that Shaffer had a poor history of promoting women is too
> generalized to have any statistical significance. She claims that Shaffer only
> promoted a total of four women into management positions and only hired two
> women into staff positions. Notably, however, Lee does not tell us how many
> people Shaffer promoted in total and she provides no evidence as to relative
> qualifications. Lee also claims that although "the applicant list" for the seven
> management positions that Shaffer had to fill when he reorganized the company
> contained "a significant number of females," Shaffer filled all seven spots with
> men. Again, this data is statistically meaningless, because Lee has provided no
> specific context against which to measure these brief facts.

226 F.3d 1249, 1255 n.2 (11th Cir. 2000).  Here, the plaintiff has offered only descriptive data

with no significant statistical analysis as to applications, qualified pool of employees, etc.[121]

    What the case really comes down to, regardless of the rhetoric, is whether there *is*

sufficient evidence to establish the plaintiff's claim that the disparity in plaintiff's allegedly

---

[121] The court does not reach the exhaustion issue raised by the defendant.

superior qualifications is "so apparent as virtually to jump off the page and slap you in the face."

*Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1090 (11th Cir. 2004); *Cofield v. Goldkist, Inc.,*

267 F.3d 1264, 1268 (11th Cir. 2001); *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir.

2001); *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000); *Alexander v. Fulton*

*County, Ga.*, 207 F.3d 1303, 1340 (11th Cir. 2000) (all quoting *Deines v. Texas Dep't of*

*Protective & Regulatory Serv.,* 164 F.3d 277, 280 (5th Cir. 1999)).  While this court does not

attach great significance to the Carter offer, it does note the following statement in *Lee, supra:*

> Lee also attempts to use as evidence of pretext the fact that Shaffer ultimately
> hired no women for the Real Estate Services position. However, this argument is
> wholly misleading, because Shaffer originally offered the Central Position to a
> woman, Janeen Travillyan, but she turned it down.

226 F.3d at 1255.

This court cannot distinguish this case from the facts and circumstances in *Lee v. GTE*

*Florida Inc.*, 226 F.3d 1249 (11th Cir. 200) and *Cofield v. Goldkist, Inc.*, 267 F.3d 1264 (11th

Cir. 2001).  The main distinguishing factor is that, here, the defendant, after the plaintiff

complained, named a committee independent of the initial decision maker which reached the

same decision.[122]  Even assuming that the earlier decision was tainted by either age or race

discrimination, there is absolutely no evidence that the later decision was so tainted.[123]

Plaintiff's argument is in essence that, since she had seniority, she was entitled to the job.

That is not the measure.[124]  There is no direct evidence of discrimination as to age or race.

––––––––––––––––––––––

[122] In *Lee* there was *some* internal investigation of the initial decision.  226 F.3d at 1252.

[123] This court finds no such evidence as to the first decision.

[124] The plaintiff in *Cofield* had worked with the employer twenty-eight years.  267 F.3d at
1266.  The person given the position had worked for the employer eight years and was fourteen

Assuming, without deciding, that plaintiff has proved a prima facie case, defendant has articulated that it determined Burdick to be better qualified after a considered evaluation which applied reasonable criteria similar to that in *Lee*. 226 F.3d at 1252. The initial evaluation was confirmed by an independent review. Plaintiff has not presented sufficient evidence to establish pretext.

The following quotes from *Lee*[125] and *Cofield*[126] are pertinent and applicable here.

*Lee*

---

years younger than the plaintiff. *Id*. The court observed:

> Throughout her lengthy employment with Goldkist, Cofield gained experience in the operations of the poultry production business. She also performed many of the job duties associated with the Plant Superintendent position. As Unit Manger II, Cofield supervised 110 to 115 employees, but she did not have the direct authority to interview, hire, promote, or terminate employees. Cofield received favorable evaluations from her supervisors, and several of her evaluations indicated that she could perform in a Plant Superintendent position. She was disciplined only once, on September 10, 1997, for giving improper instructions to shipping personnel. This reprimand occurred during the interval between the opening of the Plant Superintendent positions in 1996 and in 1998.

*Id*. at 1266-67. The court added,

> We will not second guess Goldkist's decision to emphasize qualifications over length of service. See *Chapman* [*v. AI Transport*], 229 F.3d [1012,] 1030 [(11th Cir. 2000)] ("[F]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'") (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)).

*Id*. at 1269.

[125] It should be noted that *Lee* reversed a judgment after a trial. 226 F.3d 1249, 1251 (11th Cir. 2000).

[126] In *Cofield* the appellate court affirmed a grant of summary judgment. 267 F.3d 1264, 1265 (11th Cir. 2001).

Because the evidence Lee presented at trial to prove pretext was not legally sufficient to support a jury verdict in her favor, the district court erred in denying GTE's motion for judgment as a matter of law and we reverse.

*Lee*, 226 F.3d at 1251.

— — — — —

Shaffer testified that he ultimately chose Colin Hines because Shaffer believed Hines was more qualified than Lee (and the other candidates).

*Id.* at 1252.

— — — — —

In a failure to promote case, a plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position that she wanted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by sex. *See Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000). We have explained that "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997), *cert. denied, sub nom.*, *Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *see also Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999), *cert. denied*, 529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000) (emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir.1999) (explaining that "it is not the function of the jury to scrutinize the employer's judgment as to who is best qualified to fill the position. . . . The single issue for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination.")

*Id.* at 1253.

— — — — —

Other circuits have more clearly articulated the evidentiary burden a plaintiff must meet in order to prove pretext by showing she was substantially more qualified than the person promoted. *See Fulton County*, 207 F.3d at 1340. In *Deines*, for example, the Fifth Circuit affirmed the district court's instruction to the jury stating that "disparities in qualifications are not enough in and of themselves to

85

demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." 164 F.3d at 280. The court explained that the phrase "jump off the page and slap [you] in the face" . . . should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question. This evidentiary standard does not alter the plaintiff's evidentiary burden to prove the fact of intentional discrimination by a preponderance of the evidence. Instead, the standard only describes the character of this particular type of evidence that will be probative of that ultimate fact. *Id.* at 280-81.

*Id.* at 1254.

– – – –

Lee argues, nevertheless, that Shaffer's stated reason for denying her the promotion was pretextual because in her opinion she was more qualified than Hines. On this record, however, the evidence is insufficient to raise a genuine issue of fact regarding whether GTE's stated reason for promoting Hines instead of her is pretextual. None of Lee's proffered evidence established that she was more qualified than Hines, let alone so clearly more qualified for the position than Hines that a reasonable juror could infer discriminatory intent from the comparison. *See Fulton County*, 207 F.3d at 1340; *Deines*, 164 F.3d at 280-81; *Simms*, 165 F.3d at 1329-30. Indeed, the evidence establishes that, of the four stated criteria in the position questionnaire, Lee was clearly more qualified tha[n] Hines in only one--that of commercial real estate experience. Further, GTE never disputed that Lee had more real estate experience than Hines, but said that real estate experience was the least important of the four criteria because the real estate function of the position had been outsourced. As for the first two criteria in the position questionnaire--managerial skills and strategic planning experience--the evidence established at most that the candidates were equally qualified. As for the preference for a Bachelor's degree, Hines was decidedly more qualified than Lee.

Quite simply, this evidence does not rise to the level of proof that is required when an employee attempts to prove pretext by showing she was substantially more qualified than the person promoted. Since Lee's evidence at trial fell far short of establishing that she was clearly more qualified for the position than Hines, Lee did not meet her burden of establishing that Shaffer's proffered reason for denying her the promotion was a pretext for gender discrimination.

*Id.* at 1255.

*Cofield*

86

According to Goldkist, Bowen was hired because he was more qualified for the Plant Superintendent position than Cofield. This articulated reason casts the burden on Cofield to demonstrate that Goldkist's reason is pretextual. See [*McDonnell Douglas Corp v. Green*, 411 U.S. 792,] 804, 93 S.Ct. [1817,] 1825 [(1973)]; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The only issue for us to determine, therefore, is whether Cofield has advanced sufficient evidence for a jury to find that Goldkist's articulated reason is pretextual.

*Cofield*, 267 F.3d at 1268.

_ _ _ _ _

Cofield challenges the district court's memorandum opinion because it only addresses her ADEA claim. The district court, however, expressly granted summary judgment to Goldkist on Cofield's ADEA claim and on her Title VII claim because she failed to show pretext. Although the *McDonnell Douglas* framework originally applied to Title VII cases, it is now widely accepted that the framework applies to claims of discrimination under the ADEA as well. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141-42, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (recognizing widespread application of *McDonnell Douglas* framework to ADEA claims); *Chapman* [*v. AI Transport*], 229 F.3d [1012,] 1024 [(11th Cir. 2000)] (applying *McDonnell Douglas* framework to ADEA claim). Because the legal analysis is the same with respect to both of Cofield's claims, the district court did not need to analyze each claim separately.

*Id.* at 1268 n.6.

_ _ _ _ _

The gravamen of Cofield's pretext argument is that she was more qualified for the Plant Superintendent position than Bowen.  Cofield cannot, however, establish pretext simply by showing that she is more qualified than Bowen. *See Lee v. GTE Fla.*, Inc., 226 F.3d 1249, 1253 (11th Cir.2000). Rather, Cofield must adduce evidence that the disparity in qualifications is "so apparent as virtually to jump off the page and slap you in the face." *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir.2001); *Lee*, 226 F.3d at 1254; *Alexander v. Fulton County*, Ga., 207 F.3d 1303, 1340 (11th. Cir.2000) (all quoting *Deines v. Texas Dep't of Protective & Regulatory Serv.*, 164 F.3d 277, 280 (5th Cir.1999)). The relevant inquiry for us, then, is not to judge which employee was more qualified, but to determine whether any disparity between Bowen's and Cofield's managerial qualifications is so great that a reasonable fact-finder could infer that Goldkist did not believe Bowen to be better qualified.

*Id.* at 1268.

87

Cofield also supports her pretext claim by arguing that Goldkist relied only on subjective factors in reaching a decision not to promote her. This argument lacks merit, however, in light of our recent *en banc* decision in *Chapman*. There, we emphasized that subjective reasons can constitute legally sufficient, nondiscriminatory reasons under the *McDonnell Douglas* framework. *Chapman*, 229 F.3d at 1033.

*Id.* at 1268 n.7.

_ _ _ _ _

Put simply, any disparity in qualifications that may exist here is so slight as to fail to establish that Goldkist's reason for not promoting Cofield was pretexual. We may safely assume that Cofield was qualified to be a Plant Superintendent at Goldkist. Cofield may even be justified in believing she was more qualified than Bowen for that position. But Cofield's qualifications are not so superior as to allow a reasonable fact-finder to conclude that Goldkist's reason for hiring Bowen was pretextual. We will not second guess Goldkist's decision to emphasize qualifications over length of service. See *Chapman*, 229 F.3d at 1030 ("[F]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.' ") (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)).

*Id.* at 1269.

Substantively, this case is the mirror image of *Lee* and *Cofield*.

The defendant's motion will be granted.

This \_\_ of September, 2004.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

88